[Crim. No. 3093. First Dist., Div. One. Sept. 12, 1955.]

THE PEOPLE, Respondent, v. JEAN WILKINS et al., Appellants.

Leslie C. Gillen and John R. Golden for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

BRAY, J.—Defendants were indicted and tried on three felony counts. Defendant Jean was found guilty on count III alone, defendant Bob on count II alone. From the judgment entered thereon and the order denying a new trial, both defendants appeal.

### QUESTIONS PRESENTED

1. Sufficiency of the evidence under count II.

2. Court's refusal to order production of police records of Mrs. Peterson, Pat and Anita.

3. Instructions: (a) accomplices; (b) husband and wife not competent witnesses.

4. Error in polling the jury.

5. Is "pandering" a misdemeanor only and therefore the superior court lacked jurisdiction?

## RECORD

Count I of the indictment charged defendants with violation of section 182, Penal Code (conspiracy), by conspiring to commit the crime of pandering (Stats. 1911, p. 9; Deering's Gen. Laws, Act 1906; now Pen. Code, § 266i). Count II charged both with the crime of pandering, by procuring a girl named Pat a place as an inmate in a house of prostitution. Count III charged both with the crime of pandering, by procuring Anita a place as an inmate in such a house. The jury acquitted defendant Jean on counts I and II but convicted her on count III. It acquitted defendant Bob on counts I and III but convicted him on count II.

### 1. Evidence—Count II.

The only charge of insufficiency of evidence is directed to the conviction of defendant Bob under count II. This charge is based primarily upon the fact that both Bob and Jean were acquitted of the conspiracy charge (count I). It is contended that there was no evidence that he personally procured a place for Pat, and although the evidence showed that Jean did so, he cannot be held as an aider and abettor because Jean was found not guilty on this count.

The evidence showed the following facts: Jean and Bob were husband and wife. Jean operated a call girl business, at first from an apartment occupied by her and Bob, and later from an apartment across the hall from one they occupied. She had an arrangement with taxi drivers to produce customers, paying the drivers a percentage of the fees collected by the girls. A driver would telephone the apartment, stating he had a customer. Either Jean or Mrs. Peterson, employed by Jean as a dispatcher, would instruct the driver to take the customer to a designated hotel. Then Jean or Mrs. Peterson would phone one of the call girls and instruct her to go to the designated hotel (sometimes she was sent there in advance) and get a room for herself and the customer, giving as the name of both, a name suggested to her over the phone. Then the dispatcher would phone the hotel and reserve a room in that name. The girl would deduct from the fee paid her by the customer, her agreed share. The balance would sometimes be left in a dresser drawer of the room, sometimes given directly to Jean, and

sometimes left in an envelope at Mickey's Cigar Store. At the request of both defendants, Stanley, Jean's brother, permitted his name to be used as the proprietor of that store. Stanley's name was on the signature card for the store's bank account but it was not his signature. Bob occasionally made deposits in this bank account.

On occasion there were six call girls being used, including Anita and Pat. Pat was employed by Jean as a prostitute early in 1951. Under instructions from Jean or the dispatcher she would meet or take customers to a specified hotel. Three hotels were used by Jean for the call girl operation, the Lansdale, Uptown and DeWalt, but apparently Pat only worked in the latter two of them. After deducting her part of the fee collected in each instance, she would place the balance of the money in an envelope with her name on it, and leave it at Mickey's Cigar Store. Occasionally Pat left other girls' envelopes there.

Proving Bob's connection with the employment and use of Pat for prostitution are the following circumstances: The original employment of Mrs. Peterson as a dispatcher of call girls including her instruction as to her duties as such was made by Jean in Bob's presence in their joint apartment, which for some time thereafter was used as the place for receiving and transmitting the phone calls used in the call girl business. Later a separate apartment was used, but it was across the hall from that occupied by Jean and Bob. Bob was occasionally in the headquarters apartment while the business of dispatching girls went on. The telephones used in the operation were registered to R. W. Wilkins and one Mrs. J. Richards. Bob once boxed under the name of Richards. Mrs. Peterson worked as a clerk in the DeWalt Hotel during the periods when the call girl operations from the apartment were suspended. However, for both her services as call girl dispatcher and for her services as clerk, she was paid by check of the DeWalt Hotel. Although usually she received her check from the hotel manager, occasionally Bob gave her the paycheck. At one time in 1952 Bob instructed Mrs. Peterson to close up the call girl operation. On April 25, 1951, Pat was arrested for prostitution at the DeWalt Hotel. At the Lansdale Hotel a room had been set aside for Jean's call girls while awaiting calls. A phone was installed to transmit calls from Jean or the dispatcher. A couple of times Bob around midnight entered this room. A couple of times he went to the room to settle

disputes between the customers and the girls. The hotel had been charging the call girls' customers. $2.50 a room. Bob told the clerk to charge $5.00. Bob was the real lessee of the DeWalt Hotel, although the lease was in the name of James Ray, a brother of Jean's. At Bob's request, Ray signed the hotel checks in blank. Ray never received any of the profits of the hotel. During the period of the use of the hotel by Jean's operations there was a considerable increase of income from "transients," for example, for November, 1950 (prior to its use for prostitution) its income from "transients" was $212. For November, 1951, that income was $5,082.50. The earnings went to Jean and Bob. An accountant kept the books of the DeWalt Hotel and Mickey's Cigar Store and prepared the income tax returns for Jean and Bob. His charges were paid by DeWalt Hotel checks signed by James Ray. The total income from the cigar store was credited to Jean and Bob, although Stanley Ray's name was used as proprietor.

While the court limited evidence of occurrences prior to July 2, 1950, to the conspiracy charge and the defendants were acquitted of that charge, and from time to time limited acts and declarations of Jean to the conspiracy charge "unless they constitute specific evidence of the fact of pandering," the evidence herein mentioned tying Bob into the charge of pandering as to Pat was specific evidence of the fact of pandering.

It is obvious from the foregoing evidence that, while Jean was the manager of the call girl business and employed the girls, Bob was an active partner in it, and participated in the employment of the girls including Pat. But, say the defendants, this participation, at most, was aiding and abetting Jean and as the jury acquitted Jean of the charge of procuring Pat, Bob cannot be held as an aider and abettor of one whom the jury found did not commit a crime. However, Bob's participation was more than that of an aider and abettor. He was an active partner in the business, received a share of Pat's fees, and although he did not himself directly employ Pat, he knew of her employment for himself as well as Jean, and, of course, he knowingly shared the profits from Pat's employment. Thus he was actually a principal.

"It has been held that one who accepts into his house of prostitution a woman 'procured' by another is himself a 'procuror' of the woman" and "is guilty of procuring a place for her . . ." (*People* v. *Van Way*, 108 Cal.App.2d 129, 130,

131 [238 P.2d 56].) ■ Here, not only did Bob *accept* Pat for purposes of prostitution in the DeWalt Hotel of which he was an owner, but through his partner Jean he *employed* her. Thus there was no error in the court's refusal to give an instructed verdict in favor of Bob on count II or to grant him a new trial thereon.

2. *Police Records.*

Defendants moved the court to order the production of the cards in the San Francisco Police Department concerning the records of Mrs. Peterson, Pat and Anita, all of whom admitted having been arrested for activities connected with prostitution. Defendants' attorney practically conceded that such records would not be admissible in evidence, but stated that he hoped to obtain information from them which, if not admissible, he could use in the cross-examination of said persons.

In *Runyon* v. *Board of Prison Terms and Paroles,* 26 Cal. App.2d 183 [79 P.2d 101], the court held that parole board records were not subject to public inspection. ''. . . the courts have consistently declared that in another class of cases public policy demands that certain communications and documents shall be treated as confidential and therefore are not open to indiscriminate inspection, notwithstanding that they are in the custody of a public officer or board and are of a public nature. (23 R.C.L., pp. 160-163.) Included in this class are documents and records kept on file in public institutions, concerning the condition, care and treatment of the inmates thereof, and *the files in the offices of those charged with the execution of the laws relating to the apprehension, prosecution and punishment of criminals.*'' (Pp. 184-185; emphasis added.)

In *People* v. *Santora,* 51 Cal.App.2d 707, 712 [125 P.2d 606], it was held that the defendant was not entitled to examine a report made by a police officer relating to a conversation he had had with the complaining witness. Concerning papers in a sheriff's office, the court said in *People* v. *Pearson,* 111 Cal.App.2d 9, 29 [244 P.2d 35] : ''They contained confidential information. To expose them to the bookie shopkeepers and gamblers would have given such elements three leaps ahead of the vice probers and law enforcers. They were not open to the public.''

■ Significantly, it has been held that section 1000, Code of Civil Procedure (the inspection or discovery process

378

section), does not apply to criminal proceedings. (*People* v. *Ratten*, 39 Cal.App.2d 267, 271 [102 P.2d 1097].)

█ Defendants have cited no case supporting their contention that the confidential records of the police department are open to the inspection of a defendant in what is undoubtedly a "fishing expedition." It should be pointed out also, that here the trial court requested defendants to state the materiality of the records in question. Defendants did not do so, claiming they had the right to see these records.

3. *Instructions.* (a) Accomplices.

█ Defendants offered an instruction to the effect that if Pat and Anita knowingly aided and abetted the defendants to violate the law as charged, then the jury could find that the girls were accomplices of the defendants. Obviously the instruction does not state the law. Insofar as it instructs that a procured woman could be an accomplice in the crime of pandering for her own procurement, it is directly contrary to the law. That rule is well settled. (See *People* v. *Brown,* 61 Cal.App. 748 [216 P. 58]; *People* v. *Montgomery,* 47 Cal.App.2d 1, 10 [117 P.2d 437].) █ It is true that if a procured woman aids and abets in the procurement of another woman, the former could be an accomplice. (See *idem,* p. 15.) █ However, as said in the same case (p. 15) the refusal to give an instruction to that effect cannot be error if there is no evidence that the woman in question aided and abetted in the procurement of the other woman. In our case defendants have cited, and we have found, no evidence that Pat had anything to do with the procurement of Anita, nor Anita with the procurement of Pat. █ Pat testified that on occasion she had taken to Mickey's Cigar Store envelopes belonging to "the other girls that were employed." Assuming that Anita was one of these, this would not constitute aiding and abetting in the crime of pandering. The pandering, i.e., the placing of Anita in a house of prostitution, had long since taken place. Thus the instruction was properly refused, as Pat and Anita were not accomplices of defendants. In view of that fact, there of course could be no error in the instruction which the court gave, affirmatively stating that Pat and Anita were not accomplices.

(b) Husband and Wife.

█ Defendants offered an instruction to the effect that neither a husband nor a wife is a competent witness against the other and hence neither Bob nor Jean could testify.

Section 1322, Penal Code, provides: "Neither husband nor wife is a competent witness for or against the other . . . except with the consent of both. . . ." The element of consent was left out of the proposed instruction. Thus the instruction went too far. In *People* v. *Singh*, 182 Cal. 457 [188 P. 987], it was held that if one spouse, a party to an action and present in court, relies upon the incompetency of the other to testify, he must make a proper objection to her *competency* and that objections to her *testimony* rather than to her *competency* were not sufficient to prevent her from testifying. In *People* v. *Van Skander*, 20 Cal.App.2d 248, 254 [66 P.2d 1228], it was held that failure by the husband to object to the wife's testifying constituted a waiver. In *People* v. *Klor*, 32 Cal.2d 658, 663 [197 P.2d 705], after pointing out that in *People* v. *Moore*, 111 Cal.App. 632 [295 P. 1039], it was held that there was nothing in the statute which required that an inquiry by the prosecution as to whether a defendant wife would object to her husband's testifying be secret or outside the presence of the jury, the court said: "Recent authority is to the effect that if the prosecution desires to use the husband or wife of the defendant as a witness the proper procedure is to offer the spouse as a witness, subject to the claim of privilege by the defendant." In *People* v. *Briggs*, 20 Cal.2d 42, 47 [123 P.2d 433], the court refused to find that a statement by the court that there is a rule of law which provides that the wife cannot testify against the husband *without his consent* prejudiced the defendant's rights. Moreover, as pointed out above, the proposed instruction omitted the phrase "without the wife's consent." It therefore was too broad, in that either defendant could have testified in his or her own behalf without the other's consent, provided, of course, the testimony in nowise affected the other spouse. The instruction was erroneous and hence properly denied. ▉ Inasmuch as the right of a spouse to prevent the other spouse from testifying against him is a privilege which must be claimed, the trial court is not required of its own motion to give an instruction on section 1322. If a defendant wants such instruction given he must offer a proper one.

### 4. *Polling the Jury.*

▉ In the polling of the jury there occurred one of those situations which sometimes happen in the trial of cases where everyone assumes that something was done, which actually was not done. After the verdicts were read and the jury

had affirmatively answered the clerk's query as to whether they were the jury's verdicts, defendants requested that the jury be polled. Thereupon the clerk stated that as he called their names each juror should state whether the verdict on count II which he had read was his verdict. After each juror had said it was, the following occurred: "THE COURT: Did you just ask for Count 2? THE CLERK: 2 and 3. THE COURT: Mr. Clerk, did you read Count 2 as to both Defendants? THE CLERK: Pardon me. THE COURT: The polling? THE CLERK: Yes, I asked the jurors whether or not they were their verdicts as I read them, and they replied unanimously that the verdicts were. THE COURT: Did you poll them on all the verdicts at one time? THE CLERK: I asked the jurors whether or not the verdict as requested by Mr. Gillen, Counts 2 and 3, they were their verdicts as I read them, and they stated they were their verdicts. THE COURT: All right." The court then instructed the clerk to record the verdicts. When this was done the court asked the jurors to listen to the verdicts as they stood of record. The clerk then read them as recorded. No suggestion at any time was made that the clerk had not polled as to both verdicts. Had the defendants done so, the defect could easily have been cured. It is clear from the record that the jury, the court, the clerk and the parties assumed that the jury had been polled on both counts. It would be a manifest miscarriage of justice to now set aside the verdict on count III because of the inadvertence here. There is no intimation that any juror would have denied the verdict. In *People* v. *Nichols,* 62 Cal. 518, where the court erred in denying the defendant's request that the verdict be read before being recorded, the court stated that counsel for the defendant should have objected so as to distinctly challenge the attention of the court to the irregularity, and not having done so he could not "now be heard to maintain that this Court should pay any attention to it on this appeal." (P. 521.) See also *People* v. *Lopez,* 21 Cal.App. 188 [131 P. 104], where it was held that the defendant having failed to object in the trial court to the method of polling the jury, could not do so on appeal.

Section 1404, Penal Code, provides: "Neither a departure from the form or mode prescribed by this code in respect to any pleading or proceeding, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant, or tended to his prejudice, in respect to a substantial right." Section 1260, Penal Code, concerning appeals in

criminal cases, provides: "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial." In view of defendants' failure to object to the method of polling the jury, and of these sections, and the obvious fact that all concerned considered that the jury had actually been polled on both counts, the inadvertence in nowise prejudiced defendants' rights.

### 5. *Jurisdiction.*

Defendants contend that the offense of pandering, which in *People* v. *Hirsch,* 21 Cal.App. 737 [131 P. 1062], was held committed if a woman is placed or accepted as a prostitute in a house of prostitution, is practically the same as certain other offenses, all of which are misdemeanors, and that therefore pandering can only be a misdemeanor, thus taking jurisdiction from the superior court. They point out that being a common prostitute (Pen. Code, § 647), residing in a house of prostitution (Pen. Code, § 315), keeping a house of prostitution (Pen. Code, § 316), prevailing upon a person to visit a place of prostitution (Pen. Code, § 318), keeping a minor in a house of prostitution (Pen. Code, § 309) (provided either of the girls was shown to be a minor), are all misdemeanors. They contend that the conduct proved here would have supported a conviction under any of the above sections. They rely first upon *People* v. *Smith,* 44 Cal.2d 77 [279 P.2d 33]. There the court affirmed an order setting aside an information charging pimping (Pen. Code, § 266h). The evidence at the preliminary hearing showed that the defendant had solicited a customer for a woman known to him to be a prostitute, but neither solicited nor received compensation therefor. In determining that the crime defined by the section required soliciting or receiving compensation (the section states ". . . who solicits or receives compensation for soliciting for her . . .") the court referred to a number of the Penal Code sections which are now referred to by defendants here, and which deal with prostitution and which are misdemeanors, and said that the general pattern of these sections relating to that subject indicated that the Legislature did not intend by the language of section 266h to make it a felony to merely solicit a customer for a prostitute, without the compensation element. Such reasoning does not apply to the pandering statute (Pen. Code, § 266i) which makes

the mere procurement of a female of a place as an inmate in a house of prostitution or a place in which prostitution is encouraged or allowed, a felony. Defendants' second case is *People* v. *Haydon,* 106 Cal.App.2d 105 [234 P.2d 720], where the defendant was convicted of the crime of felony, to wit, violation of Penal Code, section 72, by wilfully presenting a false claim for California unemployment insurance. Section 101 of the Unemployment Insurance Act passed many years after the adoption of section 72, Penal Code, made it a misdemeanor to make a false statement to obtain any payment under the act. We there held that in the later act the Legislature was specifically providing penalties for all false claims made in relation to unemployment relief and that it thereby by implication repealed section 72, Penal Code, *pro tanto,* as it applied to unemployment insurance claims. There is nothing in that case to support defendants' contention. This same rule was applied in *In re Williamson,* 43 Cal.2d 651 [276 P.2d 593], another case relied upon by defendants. There it was held that the later enactment of section 7030, Business and Professions Code, specifically making it a crime to conspire to violate certain licensing provisions of that code pertaining to contractors, controlled the earlier enactment of Penal Code section 182 dealing generally with conspiracies to commit a crime and making them felonies. If the principle of the last two cases applied to the situation here, such application would give defendants no comfort, for, inasmuch as the Pandering Act was originally adopted in 1911, and all of the Penal Code sections mentioned were originally adopted prior thereto, we would have to hold, if the offense of pandering is the same as the other offenses, that the later felony statute repealed *pro tanto* the earlier misdemeanor sections. The crime of pandering as set forth in section 266i is not the same as any of the other crimes. Assuming that any of the offenses in the Penal Code sections mentioned are included in the offense of pandering, it has never been held that the fact that a greater offense includes a lesser offense is a bar to a conviction of the greater offense.

The judgment and the order denying the motion for new trial are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied September 27, 1955, and appellants' petition for a hearing by the Supreme Court was denied October 5, 1955.