[Crim. No. 5896. In Bank. Dec. 31, 1956.]

## THE PEOPLE, Respondent v. RICHARD G. RISER, Appellant.

568

William H. Coburn, Jr., under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Richard G. Riser and his brother Roscoe R. Riser were charged by indictment with the murder of Earl and Pauline Hastings. The jury returned verdicts of guilty of murder in the first degree, without fixing the punishment at life imprisonment in the case of Richard G. Riser. The court denied his motion for a new trial and sentenced him to death. His appeal to this court is automatic under section 1239, subdivision (b) of the Penal Code.

Just before midnight on July 11, 1955, Earl and Pauline Hastings, proprietors of the Hilltop Café near Oakdale in Stanislaus County, were shot and killed during the course of a robbery of their café. Mr. Basford, a customer, left the café about 11:30 p. m. On his way out he passed two men who remarked that they were going in to have a beer. He was unable to identify either of the men, but thought that they had driven up to the Hilltop in a two-tone Chrysler, Buick or Pontiac.

When these men entered the café, the only persons present were two customers, Mrs. Burgess and Mr. Pantel, both seated at the bar, and the Hastings. The men sat on stools at the end of the bar away from the other customers and ordered beers. After they had ordered a second round of beers, the shorter of the two rose from his stool, drew a gun, and announced, "This is a stick-up." The other man, who was also armed, silently took a position by the front door, while his companion went behind the bar where the Hastings were. In an attempt to prevent the robbery, Mr. Hastings seized a bottle and attacked the gunman. In the ensuing struggle Hastings was struck several times on the forehead and shot. The same gunman then shot and killed Mrs. Hastings, apparently as she was trying to reach a gun. Then he stepped over Mr. Hastings' body, rifled the cash register, and departed with the gunman at the door.

The police arrived shortly after midnight, removed the bodies, and searched and photographed the premises. They recovered several bullets fired by the gunman, and dusted for fingerprints bottles and glasses found on the bar in front of the stools used by the two men.

Mrs. Burgess identified Richard and Roscoe Riser as the two gunmen and testified that Richard had done the shooting. She admitted that she had been in the bar since 7:30 p. m. and had had five beers, that the bar was quite dark, and that she could not see one of the men too well. Mr. Pantel testified that he thought Richard was the man who did the shooting, but was not positive; that he had not seen Roscoe before the police lineup at Stockton, and that the man at the door appeared to be of Filipino or Mexican extraction. Expert witnesses testified that fingerprints found on a bottle and a glass removed from the bar were the fingerprints of Richard Riser, and that bullets found in a brief case in Roscoe's Chrysler were similar in composition to bullets found at the scene of the crime. The killing had been done with a Smith and Wesson .38 Special revolver. This gun was never recovered, but according to expert testimony a holster found in Roscoe's car had once carried a Smith and Wesson .38 Special revolver. The brothers' defense was an alibi: that they had been in Stockton on the night of July 11th.

During the *voir dire* examination of jurors, Hardy M. Dunavin stated that he did not believe in capital punishment, that nothing would prevent his finding defendant guilty if the evidence warranted it, but that in no event would he vote for the death penalty. In response to the court's question whether he entertained conscientious scruples that would prevent his finding defendant guilty if the offense charged could be punishable with death, he replied, "No." On the basis of these answers, and over defendant's objection, the court sustained a challenge by the prosecution under section 1074, subdivision 8, of the Penal Code.

Section 1074, subdivision 8, provides that: "A challenge for implied bias may be taken for all or any of the following causes, and for no other . . . 8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror." Defendant contends that, although this provision requires the exclusion of jurors whose determination of guilt would be affected by their views of capital punishment, neither its language nor its policy require the exclusion of those whose assessment of punishment alone would be influenced, and that section 190 in providing that a person found guilty of murder in the first degree "shall suffer death, or confinement in the state prison for life, at the discretion

of the jury . . ." has made the determination of guilt and the assessment of punishment separate questions. The prosecution contends that the statute and decisions of this court require exclusion even when scruples go only to the assessment of punishment.

In support of its position the prosecution cites *People* v. *Ah Chung,* 54 Cal. 398, 402, and *People* v. *Amaya,* 134 Cal. 531, 535 [66 P. 794], where this court upheld challenges under section 1074, subdivision 8. In neither of those cases, however, would the effect of the juror's opinion have been confined to the assessment of punishment. Because the jurors stated that they would not find the defendants guilty on the basis of circumstantial evidence alone when the penalty might be death, it was clear that although they were not unqualifiedly opposed to capital punishment, their views of its seriousness would affect their weighing the evidence in the determination of guilt. (See also *People* v. *Warner,* 147 Cal. 546, 550 [82 P. 196].)

Likewise distinguishable is *People* v. *Cebulla,* 137 Cal. 314, 317 [70 P. 181], because the juror there stated that his conscience would not permit him to bring in a verdict of guilty. Since the practical effect of permitting such a juror to serve would be to assure acquittal, the distinction between his state of mind and that of juror Dunavin in the present case is not merely verbal. For the same reason *People* v. *Sanchez,* 24 Cal. 17, 22, *People* v. *Goldenson,* 76 Cal. 328, 346 [19 P. 161], and *People* v. *Miller,* 177 Cal. 404, 407 [170 P. 817], are not direct authority in the present situation. In each of these cases the juror stated that his conscientious opinion would affect his determination of guilt. The Sanchez case came at a time when the jury had no discretion to fix the punishment, so that the only way a juror could effectively express his opposition to capital punishment was by finding the defendant not guilty. Similarly in the Goldenson and Miller cases, although the jury had by then been given discretion to choose between death and life imprisonment, it was not yet clear that one juror acting alone could prevent imposition of the extreme penalty. Before *People* v. *Hall,* 199 Cal. 451, 453-458 [249 P. 859], it was widely thought that the death penalty remained the norm, and that a unanimous jury was needed to reduce the penalty to life imprisonment, so that the juror's only course was to find the defendant not guilty.

*People* v. *Rollins,* 179 Cal. 793, 795-796 [179 P. 209], also came before *People* v. *Hall,* and may be distinguished on the

same ground as these other cases. But the court articulated
a broad reason for excluding from the jury those who are op-
posed to the death penalty, even though their scruples would
not prevent their finding the defendant guilty: "[T]he dis-
cretion given to the jury [by § 190] to provide for life im-
prisonment in such a case is not an arbitrary discretion to
be exercised without regard to the circumstances of the par-
ticular case, but only where it appears to the jury that there
is some circumstance that warrants or justifies the imposition
of the lesser punishment." (179 Cal. at 796.) General views
of the social desirability or moral permissibility of capital
punishment could logically have no place among the factors
influencing the exercise of a discretion so conceived. (See
also *People* v. *Collins,* 105 Cal. 504, 512 [39 P. 16]; *People*
v. *Majors,* 65 Cal. 138, 148 [3 P. 597, 52 Am.Rep. 295]; *cf.*
*People* v. *Tanner,* 2 Cal. 257, 258-260.) Our decisions since
the Rollins case have without discussion systematically ex-
cluded jurors opposed to the death penalty, apparently ac-
cepting the reasoning of the Rollins case in regard to the rela-
tion between sections 190 and 1074, subdivision 8. (*People*
v. *Riley,* 35 Cal.2d 279, 284 [217 P.2d 625]; *People* v. *Hoyt,*
20 Cal.2d 306, 318 [125 P.2d 29]; *People* v. *Kynette,* 15 Cal.2d
731, 744-745 [104 P.2d 794], cert. denied, 312 U.S. 703 [61
S.Ct. 806, 85 L.Ed. 1136].)

We have recently criticized this interpretation of section
190 in *People* v. *Green,* 47 Cal.2d 209 [302 P.2d 307], hold-
ing it error to instruct a jury that it must find mitigating cir-
cumstances in a case to justify fixing the punishment at life
imprisonment. ▮ Section 190 does not impose the death
penalty, leaving discretion with the jury to substitute a lesser
penalty; it imposes neither death nor life imprisonment, but
with a perfectly even hand presents the two alternatives to
the jury. The Legislature, perhaps because of the very gravity
of the choice, has formulated no rules to control the exercise
of the jury's discretion.

▮ We did not suggest in the Green case, however, that
section 190 did not require of the jurors a meaningful choice
between these alternatives, a choice fundamentally based on
the evidence and made during and not before deliberation on
the verdict. The statute calls for the exercise of a legal discre-
tion, not for the unswerving application of views formulated
before trial that will compel a certain result no matter what
the trial may reveal.

▮ Admittedly, a literal reading of section 1074, sub-

division 8, does not compel the exclusion of jurors incapable of exercising the discretion contemplated by section 190.* It would be doing violence to the purpose of these sections of the Penal Code, however, to construe section 1074, subdivision 8, to permit these jurors to serve. It would in all probability work a de facto abolition of capital punishment, a result which, whether or not desirable of itself, it is hardly appropriate for this court to achieve by construction of an ambiguous statute.

Defendant contends that the admission in evidence of certain guns, holsters, belts, and shells was erroneous on ·the ground that they were not relevant to any issue in the case. On the morning of July 23rd, almost two weeks after the homicides, police found in Roscoe's Chrysler a brief case containing three holsters, two leather belts, each with twelve rounds of .38 special shells, a box of .22 shells, and fifty-nine .38 special shells. Two more .38 shells were found in the seat of the automobile. On the same day police arrested Richard and seized a loaded Colt .38 revolver in his possession. Later, following directions given them by Roscoe, they discovered a P38 automatic with a clip of shells in a cesspool. The court overruled objections to testimony describing the finding of these objects and also admitted them into evidence.

Some of the .38 special shells contain bullets that were copper-coated factory loads, and others contained handcast lead bullets. There was expert testimony that the factory loads resembled in weight and shape a factory-load bullet found at the scene of the crime, and although the expert could not say that they came from the same box as that bullet, he did maintain that they were of the same type and from the same manufacturer. Defendant brought out that this type of bullet is in common use throughout the country; nevertheless, the similarity testified to by the expert, together with the prosecution's showing that the .38 shells found in the brief case would fit the type of revolver known to have been used in the killings, justified the trial court's admitting the factory loads.

The relevancy of the hand-cast bullets was even clearer. There was expert testimony, based on spectroscopic analysis

---

*The awkwardness of testing the juror by use of the exact language of section 1074, subdivision 8, was made abundantly clear in the present case. Time and again the court questioned the juror in the statutory language, and time and again the juror replied that he did not entertain such an opinion ''as would prevent him finding the defendant guilty.'' Finally, in order to make it clear to the juror that he was being asked if he opposed the death penalty, the court was compelled to abandon the statutory language.

of the metal in the bullets, that those found in the brief case were probably poured from the same batch of lead as the hand-cast bullets found at the scene of the crime. The expert found ''a remarkable resemblance.''

As to the holsters, experts testified that markings in People's Exhibit No. 26 indicated that it had once carried a Smith and Wesson .38 Special revolver. Even if this is a popular gun, we cannot say that possession of the holster was not relevant to the issue of the Risers' possession of the murder weapon.

The prosecution's own witness established that the bullets found at the scene of the crime had been fired from a Smith and Wesson .38 Special revolver, not from either the Colt .38 or the P38 that the court admitted into evidence. When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon. (*People* v. *Ferdinand,* 194 Cal. 555, 563 [229 P. 341] ; *People* v. *Nakis,* 184 Cal. 105, 113-114 [193 P. 92].) When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons. (*People* v. *Riggins,* 159 Cal. 113, 121 [112 P. 862] ; *People* v. *O'Brien,* 130 Cal. 1, 5 [62 P. 297] ; *People* v. *Yee Fook Din,* 106 Cal. 163, 165-167 [39 P. 530] ; *People* v. *Wong Ah Leong,* 99 Cal. 440 [34 P. 105].) *People* v. *Beltowski,* 71 Cal.App.2d 18, 23 [162 P.2d 59], cited by the prosecution as contrary to this proposition, is adequately distinguished in *People* v. *Richardson,* 74 Cal.App.2d 528, 541-542 [169 P.2d 44], on the ground that no specific weapon was relied on in the Beltowski case. It was error therefore to admit the Colt, two of the holsters, the belts, and the box of .22 shells. The P38 was admissible on other grounds that appear below.

Defendant, however, was not prejudiced by these errors. The shells and one holster were clearly admissible, and from these the jury would have concluded that defendant possessed firearms. The admission of the Colt, more holsters, belts, and shells added little to the jury's knowledge gained from evidence correctly admitted. The introduction of the

Colt may have actually benefited defendant, for it provided an explanation for his possession of the .38 shells. An expert testified that these shells would fit either a Colt or a Smith and Wesson .38 Special, and without the Colt in evidence the jury might more easily have concluded that the ammunition was kept for a Smith and Wesson.

Defendant next cites as prejudicial error the introduction of evidence of other crimes. On the stand defendant maintained that the only pistols he had ever owned were the Colt, the P38, and a toy cap pistol, and he denied having a Smith and Wesson .38 Special. He stated that he had obtained the P38 from a sailor in the New Viking Bar, and denied having told a police officer that he had taken it from Doc's Village, a different bar. Officer Dutil then testified that defendant had told him that he had taken the P38 from Doc's Village on June 29, 1955. The prosecution followed this with testimony by the bartender at Doc's Village that the two brothers had robbed Doc's Village on June 29th, that each had been armed with a blue steel gun, and that they had taken away with them a P38 kept behind the bar. Finally, the owner of Doc's Village identified the P38 found in the cesspool as the one that had been kept behind the bar.

Evidence of other crimes is not admissible when it sole effect is to show a criminal disposition, but if it "tends logically and by reasonable inference to establish any fact material for the prosecution, or overcome any material fact sought to be proved by the defense, [it] is admissible although it may connect the accused with an offense not included in the charge." (*People* v. *Woods*, 35 Cal.2d 504, 509 [218 P.2d 981] ; see *People* v. *Citrino*, 46 Cal.2d 284, 288 [294 P.2d 32].)

The cross-examination of defendant to discover whether he had ever owned a Smith and Wesson .38 Special and when he had acquired the P38, and the testimony of the witnesses from Doc's Village, tended to establish that the Risers entered Doc's Village on June 29th armed with two blue steel guns; that they there acquired the P38; that therefore they had at one time been in possession of three guns, and that only two of these were known not to have been Smith and Wesson .38 Specials. The P38 was admissible to corroborate the bartender's testimony that the Risers acquired the P38 at a time when they already had two guns. This evidence that the Risers had a third gun of unknown make was relevant to show that they had the means to commit the crime. (See

*People* v. *Simeone,* 26 Cal.2d 795, 804-805 [161 P.2d 369].)

The trial court closely limited the effect of the testimony on the Doc's Village incident to showing how the Risers were armed and when they obtained the P38, and specifically instructed the jury against drawing broad inferences of criminal tendencies. The court's further limitation of the testimony to purposes of impeachment was, if anything, unduly favorable to defendant.

Roscoe Riser also took the stand. On direct examination he stated that he had never been involved in a robbery; on cross-examination the district attorney gave detailed descriptions of numerous robberies committed in San Francisco by Roscoe and Richard, intermittently asking Roscoe if he had not furnished these descriptions in admitting the robberies to the police. Roscoe denied the prior inconsistent statements.

■ Defendant complains that the court should have immediately instructed the jury that these references to his participation in robberies could in no way be used against him, since the prosecution did not show that he had been present when Roscoe was interrogated. Throughout the trial the court, whenever requested to do so, instructed clearly and at length that statements made by one defendant were not evidence against another defendant who had not been present, and it repeated this warning in its general instructions at the close of the trial. There is no reason to suppose that the jury, even though not reinstructed at this particular juncture, did not understand and apply the general principle the court had laid down. Furthermore, since defendant did not request the court to repeat its warning at this time, he cannot now complain.

■ Defendant says that it was misconduct for the prosecutor to fail to produce witnesses that Roscoe had in fact made the statements attributed to him; that since the prosecutor apparently had neither the intention nor the means of establishing the truth of his allegations, he must have made them solely to inflame the jury against the brothers. (*Cf. People* v. *Evans,* 39 Cal.2d 242, 248-249 [246 P.2d 636].) We must assume, however, that in view of the court's instructions the jury did not consider defendant's alleged participation in the robberies. The injury, if any, was to Roscoe, and his appeal is not now before us.

As a further error, defendant complains of the admission in evidence of a bottle and a glass bearing fingerprints testified to be the fingerprints of Richard Riser. Deputy Sheriff

Lochry identified the bottle and glass as articles that he had taken from the Hilltop Café. When he arrived at the Café, early in the morning of July 12th, he found several bottles, glasses, and salt cellars on the bar. He dusted them for fingerprints, put them in a box, and locked the box in the sheriff's identification truck. About 4 or 5 a. m. he returned to the sheriff's office and put the articles in an open book case in an office that he shared with another police officer. This office was unlocked; it was flanked on one side by an office shared by two or three persons, and on the other side by a hall leading to a general office. According to Lochry, the evidence remained in the book case approximately four hours, until about 8 :30 a. m., when it was removed and there-after kept under lock and key or in the custody of specific persons.

Defendant contends that in view of these facts the prosecution failed to establish continuous possession, which is a necessary foundation for the admission of demonstrative evidence; that since someone could have altered the prints or imposed wholly new ones during the four hours the glass and bottle were left unguarded in the book case, the prosecution has not sufficiently identified the prints as those that existed when the articles were removed from the bar. Defendant would require the prosecution to negative all possibility of tampering.

Undoubtedly the party relying on an expert analysis of demonstrative evidence must show that it is in fact the evidence found at the scene of the crime, and that between receipt and analysis there has been no substitution or tampering (see *People* v. *Coleman*, 100 Cal.App.2d 797, 801 [224 P.2d 837] ; 21 A.L.R.2d 1216, 1219, 1236-1237), but it has never been suggested by the cases, what the practicalities of proof could not tolerate, that this burden is an absolute one requiring the party to negative all possibility of tampering. (See, e.g., *People* v. *Brown*, 92 Cal.App.2d 360, 365 [206 P.2d 1095] ; *Commonwealth* v. *Mazarella*, 279 Pa. 465, 472 [124 A. 163].)

The burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration.

The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted

for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. (See *Dobson* v. *Industrial Acc. Com.*, 114 Cal.App.2d 782, 785 [251 P.2d 349]; *McGowan* v. *Los Angeles,* 100 Cal.App.2d 386, 389-392 [223 P.2d 862, 21 A.L.R.2d 1206]; *People* v. *Smith,* 55 Cal.App. 324, 327-329 [203 P. 816]; *Novak* v. *District of Columbia,* 160 F.2d 588 [82 App.D.C. 95].) ▮ Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight. (See *People* v. *Tomasovich,* 56 Cal. App. 520, 529 [206 P. 119]; *State* v. *Smith* (Mo.), 222 S.W. 455, 458-459.) ▮ In the present case defendant did not point to any indication of actual tampering, did not show how fingerprints could have been forged, and did not establish that anyone who might have been interested in tampering with the prints knew that the bottles and glasses were in Deputy Sheriff Lochry's book case. There was no error in the court's ruling.

▮ In the course of instructing the jury the court stated that "Although there are two degrees of murder, the evidence in this case is such that either both of the defendants, or one of them, is innocent of the charge of murder.... or one or both of the defendants are guilty of murder in the first degree. ... For murder which is committed in the perpetration or attempt to perpetrate . . . robbery . . . is murder of the first degree; whether the killing was intentional, unintentional or accidental." (See Pen. Code, § 189.)

Defendant contends that it was error for the court thus to remove from the jury's consideration the degree of murder, and whether in fact it had been in the course of a robbery or attempted robbery. The evidence, however, was overwhelming that the homicides had been committed in the perpetration of a robbery, and when there is no reasonable doubt on this issue the court is justified in withdrawing it from the jury. (*People* v. *Sanford,* 33 Cal.2d 590, 595 [203 P.2d 534]; *People* v. *Perkins,* 8 Cal.2d 502, 516 [66 P.2d 631]; see *People* v. *Rupp,* 41 Cal.2d 371, 381-382 [260 P.2d 1].) Defendant offered no evidence indicating that a robbery had not been committed, and in his own statement of facts to this court he says that "the killing took place during the commission of a robbery."

▮ In addition to this instruction on felony murder, the court gave the jury the code definition of murder, in-

cluding the provisions on premeditated murder and second degree murder, and the code definition of robbery. (Pen. Code, §§ 189, 211.) These instructions were unnecessary because they covered questions that had already been withdrawn from the jury by the first instruction. But if any confusion was generated by these instructions, it could only have benefited defendant by leading the jury to think that the question of the degree of murder was still open to its determination. (See *People* v. *Peterson*, 29 Cal.2d 69, 78-79 [173 P.2d 11], cert. denied, 331 U.S. 861 [67 S.Ct. 1751, 91 L.Ed. 1867].)

In the midst of its deliberations the jury returned to the courtroom and the following discussion took place between court and jury:

"THE FOREMAN: The question was, under those circumstances would either of the defendants be eligible for parole if a recommendation was made for life imprisonment.

"THE COURT: I see. Well, the answer of the Court is for the purpose of determining the punishment and for that purpose, only, it is the law that a person convicted of First Degree Murder and sentenced to life imprisonment may be eligible for parole. Does that answer your question?

"THE FOREMAN: Yes.

"THE COURT: I might state that it further provides that they may be eligible for parole but not before he has served seven calendar years. Now, I just state that the law is worded that way."

The next day the jury informed the court that it had one verdict complete as to one of the brothers. It then submitted a written question to the court asking whether "In the event of what is a verdict of guilty on both counts one and two, is there any recommendation the Jury can make that would preclude the possibility of parole during the lifetime of a person convicted." The court answered, "No." Within an hour the jury returned its verdicts of guilty, fixing the punishment at life imprisonment for Roscoe, but with no specification of punishment for Richard. Under the instructions that were given the verdict as to Richard necessarily implied that the jury fixed the punishment at death.

It is now well established that although the jury may not weigh the possibility of pardon or parole in determining the guilt of an accused, it may consider these consequences in exercising its discretion to choose between different punishments. (*People* v. *Reese*, 47 Cal.2d 112, 116-117

[301 P.2d 582] ; *People* v. *Byrd,* 42 Cal.2d 200, 206-208 [266 P.2d 505], cert. denied, 348 U.S. 848 [75 S.Ct. 73, 99 L.Ed. 668] ; *People* v. *Barclay,* 40 Cal.2d 146, 158 [252 P.2d 321] ; *People* v. *Osborn,* 37 Cal.2d 380, 384-385 [231 P.2d 850].)

█ Defendant contends, however, that it was error for the court to give the jury information about eligibility for parole before it had determined the question of guilt or innocence. This contention is without merit. In both *People* v. *Reese, supra,* and *People* v. *Byrd, supra,* we upheld the trial court when it had included in its original instructions to the jury the information that one sentenced to life imprisonment could be paroled. In those cases, as in the present one, the court cautioned the jury against allowing this information to influence its determination of guilt. Prudence requires no more ; it does not require that the jury be kept in ignorance of the consequences of different penalties until it has finally determined guilt. Moreover, it is by no means clear in the present case that the jury, when it addressed its questions to the court, had not already found defendant guilty.

█ Defendant also claims that the court misinformed the jury when it said that defendant could be paroled in seven years if sentenced to life imprisonment; that because of sections 3024, subdivision (b), and 3048 of the Penal Code, defendant could not be paroled in less than ten years.

Section 3024, subdivision (b), provides that the minimum terms of sentence and imprisonment ''for a person previously convicted of a felony either in this State or elsewhere, and armed with a deadly weapon [is] . . .10 years. . . .'' As we pointed out in *People* v. *Reese,* 47 Cal.2d 112, 117-118 [301 P.2d 582], this provision is in an article of the code concerned with the length of sentences and the fixing thereof, and not with how much of a sentence must be served before a prisoner is eligible for parole. That subject is covered in a different article, embracing sections 3040 to 3065. Section 3049 provides that a person whose minimum term of imprisonment is more than one year may be paroled at any time after the expiration of one-third of the minimum term. Section 3046 limits section 3049 by stating that no person imprisoned under a life sentence may be paroled until he has served at least seven calendar years. Authority to grant parole after a certain portion of a minimum term has been served is not destroyed by a provision such as section 3024 which sets the minimum term itself.

Section 3048, also cited by defendant, limits eligibility for

parole when a defendant has been adjudicated an habitual criminal. Such an adjudication cannot be made unless the prior convictions on which it is to be based have been charged in the indictment. (*People* v. *Wagner*, 78 Cal.App. 503, 506-507 [248 P. 946].) No prior convictions were charged in the indictment in the present case, therefore section 3048 has no application.

Defendant's most serious objections go to the eyewitness testimony of Mrs. Burgess and Mr. Pantel. One charge is that the prosecution improperly coached Mrs. Burgess into identifying defendant as the man she had seen at the Hilltop. Mrs. Burgess identified defendant in a Stockton police lineup. She admitted that after this Lieutenant Kilroy had been to her house on numerous occasions, shown her pictures and taken her for rides, and that after her appearance before the grand jury the district attorney had discussed her testimony with her on several occasions. There is no evidence, however, that she was prepared in any way before the lineup, and she specifically denied having seen pictures of defendant before that time. This evidence is insufficient to justify a conclusion that Mrs. Burgess' identification was the result of an idea planted in her mind by the prosecution.

Before trial defendant moved for an order directing the prosecution to furnish him with a copy of the fingerprint taken from the bottle, and directing the sheriff's office of Stanislaus County to allow him to inspect statements made to police by Mrs. Burgess and Mr. Pantel immediately after the homicides. The motion was denied.

After cross-examination of witnesses Burgess and Pantel, defendant had issued a subpoena duces tecum addressed to Captain Ross of the sheriff's office commanding him to produce the originals of the same statements sought by the pretrial motion. The affidavit in support of the subpoena asserted that the statements were material and relevant to issues in the case and contradictory to the witnesses' present testimony. Defendant first learned of the statements from local newspapers, which reported Captain Ross as saying that the witnesses had described the man who did the shooting as tall and slender, with a dark complexion and black hair, and the other man as dark complexioned with black hair. Apparently the Riser brothers have blond hair and light complexions, and differ significantly in other characteristics from the newspaper descriptions. On cross-examination Mrs. Burgess admitted having made a statement to the police. She claimed,

however, that she described the man who did the shooting as stocky, not as tall and slender, and although she admitted describing the man by the door as dark complexioned, she denied having said that he had black hair.

The prosecution moved for an order vacating the subpoena. Despite defendant's argument that he was entitled to the statements for purposes of impeachment, the motion was granted on the ground that the subpoena sought to bring into court evidence that could not be used for impeachment and was not otherwise admissible. Defendant contends that this order was erroneous.

Originally at common law the accused in a criminal action could not compel production of documents or other evidence in the possession of the prosecution. (See 6 Wigmore, Evidence (3d ed. 1940), 475-476; 8 *id.* at 219-220.) Production was denied before trial on the ground that to compel the prosecution to reveal its evidence beforehand would enable the defendant to secure perjured testimony and fabricated evidence to meet the state's case. It was felt, furthermore, that to allow the defendant to compel production when the prosecution could not in its turn compel production from the defendant because of the privilege against self incrimination would unduly shift to the defendant's side a balance of advantages already heavily weighted in his favor. (See generally *State* v. *Tune,* 13 N.J. 203 [98 A.2d 881]; *State ex rel. Robertson* v. *Steel,* 117 Minn. 384 [135 N.W. 1128, Ann.Cas. 1913D 343]; 6 Wigmore, Evidence, *supra,* at 475-476.)

Whatever the force of these arguments when directed to pretrial discovery, they have little or no application when production is sought by subpoena during trial of statements referred to on cross-examination. The question then is not whether the defendant will be allowed advance disclosure of evidence upon which the prosecution plans to base its case, but whether he will be allowed any disclosure of evidence that the prosecution does not intend to produce in court at all. (See *United States* v. *Krulewitch,* 145 F.2d 76, 78 [156 A.L.R. 337].) Furthermore, the additional possibility that the defendant will obtain perjured testimony or fabricated evidence as a result of disclosure at this point in the proceedings is too slight to justify denying production. The decisions of this court have always impliedly recognized that on a proper showing a defendant in a criminal case can compel production when it becomes clear during the course of trial that the

prosecution has in its possession relevant and material evidence. Production has been denied, not on the ground that there was never any right to it, but because the requirements justifying production had not been met in the particular case. (*People* v. *Gallardo,* 41 Cal.2d 57, 67 [257 P.2d 29]; *People* v. *Bermijo,* 2 Cal.2d 270, 276 [40 P.2d 823]; *People* v. *Glaze,* 139 Cal. 154 [72 P. 965].)

There is authority to the contrary (see, e.g., *Little* v. *United States,* 93 F.2d 401, 407, cert. denied, 303 U.S. 644 [54 S.Ct. 643, 82 L.Ed. 1105]; *State* v. *Rhoads,* 81 Ohio St. 397 [91 N.E. 186]), but we are convinced that the better reasoned decisions support the position implicit in our cases. (See *Gordon* v. *United States,* 344 U.S. 414 [73 S.Ct. 369, 97 L.Ed. 447]; *United States* v. *Krulewitch,* 145 F.2d 76, 78-79 [156 A.L.R. 337]; *Asgill* v. *United States,* 60 F.2d 776, 778-779; *People* v. *Walsh,* 262 N.Y. 140, 149-150 [186 N.E. 422]; *People* v. *Dellabonda,* 265 Mich. 486, 496-507 [251 N.W. 594].) ▮ Absent some governmental requirement that information be kept confidential for the purposes of effective law enforcement, the state has no interest in denying the accused access to all evidence that can throw light on issues in the case, and in particular it has no interest in convicting on the testimony of witnesses who have not been as rigorously cross-examined and as thoroughly impeached as the evidence permits. To deny flatly any right of production on the ground that an imbalance would be created between the advantages of prosecution and defense would be to lose sight of the true purpose of a criminal trial, the ascertainment of the facts. (See *Gordon* v. *United States, supra,* at 419; 8 Wigmore, Evidence, *supra,* at 219-220; *cf. People* v. *Davis,* 52 Mich. 569 [18 N.W. 362].)

In *People* v. *Glaze, supra,* we refused to order production of a statement that appeared to the court to be inadmissible for any purpose, even for impeachment. The witness had neither signed the statement nor adopted it in any way. The lower courts have consistently enforced this requirement that the evidence sought be admissible, without denying, however, that production can be had when the evidence can be used to impeach and is not confidential. (*People* v. *Wilkins,* 135 Cal. App.2d 371, 377-378 [287 P.2d 555]; *People* v. *Santora,* 51 Cal.App.2d 707, 712 [125 P.2d 606]; *People* v. *Singh,* 136 Cal.App. 233, 243 [28 P.2d 416]; *People* v. *Keyes,* 103 Cal. App. 624, 638-640 [284 P. 1096]; *People* v. *Haughey,* 79 Cal.

App. 541, 543-544 [250 P. 406]; *People* v. *Nields,* 70 Cal.App. 191 [232 P. 985]; *People* v. *Emmons,* 7 Cal.App. 685, 690-691 [95 P. 1032].) Nor do we think that the impeachment justifying production is necessarily restricted to impeachment by prior inconsistent statements to the exclusion, for example, of impeachment for bias. (See *Asgill* v. *United States, supra,* 60 F.2d at 779.)

In the present case the court denied production on the ground that the statements could not be used to impeach the witnesses. We are at a loss to understand how the court could have reached this conclusion without even seeing the statements. Whether they were in writing or signed by the witnesses the record does not show, and it is safe to say that no one but the prosecution knew. Even if they were not signed, defendant might have been able to show, by the testimony of a stenographer or other witnesses or by the admissions of Mrs. Burgess and Mr. Pantel themselves, that the statements had been accurately transcribed and therefore could be used for impeachment. (See *People* v. *Bjornsen,* 79 Cal.App.2d 519, 534-535 [180 P.2d 443]; *People* v. *Orosco,* 73 Cal. App. 580, 593 [239 P. 82].)

Obviously a defendant cannot show conclusively that a document is admissible without seeing it, and yet in order to see it he is told that he must show that it is admissible. The proper test for determining whether production must be granted is not whether the evidence has been conclusively proved admissible but whether, as stated in *People* v. *Glaze, supra,* at 158, "there is good reason to believe that the document when produced would be admissible in evidence for some purpose in the case. . . ." There must be more than a mere possibility that the statements when produced will contain contradictory matter and be in such a form that they can be used to impeach, but the chance that it may turn out eventually that they cannot be used for this purpose should not block production at the threshold.

This precise problem, the relation between admissibility and the right to production, was presented in *Gordon* v. *United States, supra,* and the court there concluded that the prosecution had not conceded enough in admitting that it would be error to refuse to order production if it would be error not to admit the evidence once produced. "[P]roduction may sometimes be required though inspection may show that the document could properly be excluded." (344 U.S.

at 418.) As in the case before us, the court was faced with a record that showed no reason why the statements once produced could not be used for impeachment.

 That the statements of Mrs. Burgess and Mr. Pantel existed and were in the possession of the prosecution or the police was never denied; that it was probable that they were inconsistent with the witnesses' testimony was shown by the newspaper accounts. Defendant was unable to prove conclusively that the statements were in a form warranting use for impeachment only because the prosecution kept them in its exclusive control. The prosecution did not claim that the necessities of law enforcement required that the statements be kept confidential, and in view of the fact that the police had released the substance of the statements to the press, there could be no such claim. Defendant was not exploring for generally useful information, but demanded particular documents reasonably thought to be usable for the specific purpose of impeachment. Finally, defendant went as far as he could without benefit of the statements, at least in the case of Mrs. Burgess. Once the witness denied the prior inconsistencies, there was nothing further defendant could do to press the impeachment. It does not appear that there were any witnesses to the statements who could recall exactly what had been said, and even if there were defendant was not compelled to rely on them if far more impressive documentary proof was at hand. We conclude that defendant sustained the burden imposed on him and that it was error to vacate the subpoena.

 In deciding whether this error was prejudicial we must determine whether there was a reasonable probability that the jury would have reached a different verdict had defendant been allowed to obtain and introduce in evidence prior inconsistent statements of the eyewitnesses. (*People v. Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) Even if we assume that prior inconsistent statements would have impaired the value of the eyewitness testimony, there remained against defendant the fingerprint evidence, the evidence that he possessed hand-cast bullets that probably had a common origin with bullets found at the scene of the crime and a holster that had once carried a Smith and Wesson .38 Special, and the evidence that he had had a gun in addition to those he admitted owning.

Weighed against this evidence was the testimony of the Risers that they had not been at the Hilltop on July 11th.

Both stated that they had been at the house of Della Fay Jones, Roscoe's girl friend, until 7:30 or 8 o'clock in the evening, and then had gone on, Roscoe and Della to a movie and Richard on a round of Stockton bars. Richard returned home about midnight and did not see Roscoe until the next morning. Della Fay Jones did not testify.

Richard had earlier told police that it was probably on the 11th that he and Roscoe had gone to Riverbank to buy furniture, returning to Stockton by way of Oakdale where they stopped at a bar. At the trial he explained that he had been confused about the dates as a result of almost continuous questioning by the police for three or four days. Roscoe could not recall the Riverbank expedition at all.

Witness Basford testified that the two men he met coming into the Hilltop Café had been in a Chrysler, Buick or Pontiac. Both brothers testified that Roscoe's Chrysler had a flat tire on the 11th, and Roscoe said that it had been left in the backyard of their mother's house from the 10th until the 13th, while they used an old Dodge converted into a truck. Their mother stated that the Chrysler had been in the yard from the 10th to the 13th, and that if it had been removed it could only have been while she was asleep. A witness for the prosecution testified that he had seen the brothers getting into the Chrysler on the afternoon or evening of the 11th, but on cross-examination his testimony proved extremely weak.

 Fingerprint evidence is the strongest evidence of identity, and is ordinarily sufficient alone to identify the defendant. (See *People* v. *Adamson*, 27 Cal.2d 478, 495 [165 P.2d 3], affd. 332 U.S. 46 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223].) Here there is in addition to the fingerprint evidence the evidence of a common origin for the handcast bullets, a "remarkable resemblance" which we have no reason to believe could be the result of chance. The evidence that the holster had once carried a Smith and Wesson .38 Special, and that defendant had possessed an unidentified third gun, although not as strong as the fingerprint and bullet evidence, contribute to an impressive total of proof identifying defendant. We are of the opinion, therefore, that it is not reasonably probable that the jury, faced with this evidence, would have chosen to believe instead the unsupported testimony of defendant that he had not been at the Hilltop Café

on the night of July 11th; accordingly, there has been no miscarriage of justice. (Cal. Const., art. VI, § 4½.)

The judgment and order are affirmed.

Gibson, C. J., Schauer, J., Spence, J., and McComb, J., concurred.

CARTER, J.—I dissent.

I cannot agree with the conclusion reached by a majority of this court that while it was error it was not prejudicial error for the trial court to deny defendant the right to produce documents containing statements by eyewitnesses allegedly contrary to those made at the trial by such witnesses. In my opinion nothing could be more prejudicial. It is impossible for an appellate court to say that the jury was not impressed by testimony which absolutely identified the defendant as the perpetrator of the crime given by persons present at the time the crime was committed.

In view of the holding in *Gordon* v. *United States*, 344 U.S. 414 [73 S.Ct. 369, 97 L.Ed. 447], it seems incredible that a majority of this court could hold that this error was not prejudicial. The same problem was there presented. The court had this to say: ''By proper cross-examination, defense counsel laid a foundation for his demand by showing that the documents were in existence, were in possession of the Government, were made by the Government's witness under examination, were contradictory of his present testimony, and that the contradiction was as to relevant, important and material matters which directly bore on the main issue being tried: the participation of the accused in the crime. The demand was for production of these specific documents and did not propose any broad or blind fishing expedition among documents possessed by the Government on the chance that something impeaching might turn up. Nor was this a demand for statements taken from persons or informants not offered as witnesses. The Government did not assert any privilege for the documents on grounds of national security, confidential character, public interest, or otherwise. . . . Indeed, we would find it hard to withstand the force of Judge Cooley's observation in a similar situation that 'The State has no interest in interposing any obstacle to the disclosure of the facts, unless it is interested in convicting accused parties on the testimony of untrustworthy persons.' [*People* v. *Davis*, 52 Mich. 569 (18 N.W. 362, 363).] In the light

of our reason and experience, the better rule is that upon the foundation that was laid the court should have overruled the objections which the Government advanced and ordered production of the documents.

"The trial court, of course, had no occasion to rule as to their admissibility, and we find it appropriate to consider that question only because the Government argues that the trial judge, in the exercise of his discretion, might have excluded these prior contradictory statements and, since that would not have amounted to reversible error, it was not such to decline their production. We think this misconceives the issue. It is unnecessary to decide whether it would have been reversible error for the trial judge to exclude these statements once they had been produced and inspected. For production purposes, it need only appear that the evidence is relevant, competent, and outside of any exclusionary rule; for rarely can the trial judge understandingly exercise his discretion to exclude a document which he has not seen, and *no appellate court could rationally say whether the excluding of evidence unknown to the record was error, or, if so, was harmless.* The question to be answered on an application for an order to produce is one of admissibility under traditional canons of evidence, and not whether exclusion might be overlooked as harmless error.

"The Court of Appeals affirmed on the ground that Marshall's admission, on cross-examination, of the implicit contradiction between the documents and his testimony removed the need for resort to the statements and the admission was all the accused were entitled to demand. We cannot agree. We think that an admission that a contradiction is contained in a writing should not bar admission of the document itself in evidence, providing it meets all other requirements of admissibility and no valid claim of privilege is raised against it. The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description and this is no less true as to the extent and circumstances of a contradiction. We hold that the accused is entitled to the application of that rule, not merely because it will emphasize the contradiction to the jury, but because it will best inform them as to the document's impeaching weight and significance. Traditional rules of admissibility prevent opening the door to documents which merely differ on immaterial matters. *The alleged*

*contradictions to this witness' testimony relate not to collateral matters but to the very incrimination of petitioners."* (Emphasis added; pp. 418-421.) It was concluded: "The Government, in its brief, argues strongly for the widest sort of discretion in the trial judge in these matters and urges that even if we find error or irregularity we disregard it as harmless and affirm the conviction. We are well aware of the necessity that appellate courts give the trial judge wide latitude in control of cross-examination, especially in dealing with collateral evidence as to character. *Michelson* v. *United States,* 335 U.S. 469 [69 S.Ct. 213, 93 L.Ed. 168]. But this principle cannot be expanded to justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony. Reversals should not be based on trivial, theoretical and harmless rulings. But we cannot say that these errors were unlikely to have influenced the jury's verdict. We believe they prejudiced substantial rights and the judgment must be *Reversed."* (Pp. 422-423.)

The eyewitness testimony was by far the most important evidence against this defendant. The murder weapon was never found; the similarity in the hand-cast bullets was only that they were "probably of common origin"; and it was thought that defendant's holster had once carried a gun of a type of the murder weapon. It would appear to me that, in Judge Cooley's language, the state should have no interest in interposing any obstacle to the disclosure of facts; that all material and relevant facts should be set forth for the determination of the jury and, if certain state witnesses have been accused of making contradictory statements relating to a material fact, those statements should also be before the jury so that it could determine for itself the trustworthiness of such witnesses. The American concept of due process most certainly encompasses the right of an accused to be confronted by trustworthy witnesses and the right to show, if he can, that witnesses against him may not be worthy of belief. Due process most certainly also encompasses the concept that the state will not seek to conceal material evidence in the accused's favor. If due process of law does not encompass such concepts, then we have most assuredly departed a long way from the very foundation upon which our system of justice rests— the ideal that every man is presumed innocent until proven guilty beyond a reasonable doubt. In the words of Mr. Justice Holmes (*Olmstead* v. *United States,* 277 U.S. 438 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376]), it is better that one

criminal escape than that the government play an ignoble part.

In *Mesarosh* v. *United States* (25 L.W. 4001, 4004, 4005) the government moved to remand the case to the trial court because of untruthful testimony given before other tribunals by Mazzei, a government witness, although contending that the testimony given in the instant case by Mazzei was "entirely truthful and credible." The government sought to have the matter remanded to the District Court for a full consideration of the credibility of the testimony of the witness Mazzei. The counter-motion of petitioners asked for a new trial. In reversing the judgments below with directions to grant the petitioners a new trial, Mr. Chief Justice Warren, speaking for the court, had this to say: "Mazzei, by his testimony, has poisoned the water in this reservoir, and the reservoir cannot be cleansed without first draining it of all impurity. This is a federal criminal case, and this Court has supervisory jurisdiction over the proceedings of the federal courts. If it has any duty to perform in this regard, it is to see that the waters of justice are not polluted. Pollution having taken place here, the condition should be remedied at the earliest opportunity. 'The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our proudest boasts. This Court is charged with supervisory functions in relation to proceedings in the federal courts. See *McNabb* v. *United States,* 318 U.S. 332 [63 S.Ct. 608, 87 L.Ed. 819]. Therefore, fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted.' *Communist Party* v. *Subversive Activities Control Board,* 351 U.S. 115, 124 [76 S.Ct. 663, 100 L.Ed. 1003].

"The government of a strong and free nation does not need convictions based upon such testimony. It cannot afford to abide with them. The interests of justice call for a reversal of the judgments below with direction to grant the petitioners a new trial."

Surely the great State of California does not need convictions based upon the deprivation of an accused's constitutional right to due process of law.

For the foregoing reasons I would reverse the judgment.

Appellant's petition for a rehearing was denied January 30, 1957. Carter, J., was of the opinion that the petition should be granted.