Filed 3/17/25  P. v. Pierce CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>DARNELL LUCIFER PIERCE,<br><br>  Defendant and Appellant. | F087100<br><br>(Super. Ct. No. BF183973A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## **INTRODUCTION**

Defendant Darnell Lucifer Pierce was found guilty of the premediated first degree murder of Mubarek Alnajar (Pen. Code, §§ 187, subd. (a), 189, count 1),[1] that occurred on January 13, 2021.[2]  Thereafter, the trial court sentenced Pierce to a total aggregate indeterminate term of 50 years to life, plus a consecutive determinate term of three years.

On appeal, Pierce contends: (1) there was "insufficient evidence to prove [he] was the perpetrator beyond a reasonable doubt . . . and the speculative inferences advocated by the prosecution are insufficient to support [his] conviction in this case[;]" (2) "[t]he trial court abused its discretion in allowing the prosecution to admit photographs of firearms [People's Exhibit Nos. 82, 83, 84, 88, & 89] that were not connected to the charged offenses along with a law enforcement witness's opinion that some of those photographs depicted a nine-millimeter pistol [because] [t]he evidence was irrelevant and thus inadmissible in this case[;]" (3) "[t]he trial court abused its discretion and violated [his] rights of due process, fundamental fairness in the trial court proceedings, and to present a complete defense by precluding the defense at the outset from presenting third party culpability evidence that involved Alnajar's drug activities, debt owed, and persons who were attempting to collect the debt[;]" (4) the prosecutor committed misconduct when she argued during her closing argument "to find [him] guilty . . . [because] there was no evidence anyone else had committed the crime" even after "the [trial] court had granted her in limine motion to exclude third party culpability evidence, over defense objection . . . [and] the comments were improper sandbagging and/or burden shifting attempts[;]" (italics omitted) and (5) these alleged errors resulted in cumulative prejudice.

As to Pierce's claims, they lack merit.  Accordingly, we affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] As we discuss in detail below, Pierce was convicted and sentenced to additional offenses and enhancements.

## STATEMENT OF CASE

On August 10, 2023, the Kern County District Attorney filed a first amended information charging Pierce with the premeditated first degree murder of Alnajar (§§ 187, subd. (a), 189, subd. (a); count 1), with the enhancement he personally and intentionally discharged a firearm that proximately caused great bodily injury or death to Alnajar (§ 12022.53, subd. (d)); unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2); unlawful possession of ammunition by a felon (§ 30305, subd. (a)(1); count 3);[3] and unlawfully resisting, delaying, or obstructing a peace officer (§ 148, subd. (a)(1); count 4). As to counts, 2 and 3, the first amended information further alleged the following factors in aggravation:

> "It is further alleged that [Pierce] . . . was armed with or used a weapon at the time of the crime, within the meaning of California Rules of Court Rule 4.421(a)(2). [¶]
>
> "It is further alleged that [Pierce], was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed, within the meaning of California Rules of Court Rule 4.421(a)(7). [¶]
>
> "It is further alleged that [Pierce's] . . . prior convictions as an[] adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness, within the meaning of California Rules of Court Rule 4.421(b)(2). [¶]
>
> "It is further alleged that [Pierce] . . . has served a prior prison term, within the meaning of California Rules of Court Rule 4.421(b)(3). [¶]
>
> "It is further alleged that [Pierce] . . . was on probation or parole when the crime was committed within the meaning of California Rules of Court Rule 4.421(b)(4). [¶]

---

[3] At trial, both parties stipulated that as to counts 2 and 3, "[Pierce] ha[d] suffered a felony conviction in the past.

"It is further alleged [Pierce's] . . . prior performance while on probation or parole was unsatisfactory, within the meaning of California Rules of Court Rule 4.421(b)(5). [¶]

"It is further alleged as to [Pierce], any other factors statutorily declared to be circumstances in aggravation or that reasonably relate to [Pierce] or the circumstances under which the crime was committed, within the meaning of California Rules of Court Rule 4.421(c)."

On August 14, 2023, a jury found Pierce guilty on all counts and enhancements. Subsequently, in a bifurcated court trial, the trial court found all the alleged aggravating factors true. Subsequently, as to count 1, the trial court sentenced Pierce to an indeterminate term of 25 years to life, plus a consecutive indeterminate term of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)). As to count 2, the trial court sentenced Pierce to the upper term of three years, to run consecutive to count 1. As to count 3, the trial court sentenced Pierce to the upper term of three years, but stayed the sentence pursuant to section 654. As to count 4, the trial court sentenced Pierce to 364 days or one year in custody, but ran this sentence concurrent to the felony sentence. The total aggregate sentence imposed was an indeterminate term of 50 years to life, plus a determinate term of three years.

## SUMMARY OF FACTS

### I.    Prosecution Case-in-Chief

#### A.    Events Prior to and Immediately After the Murder

Pierce ("DK") and Alnajar ("Fish") were business partners in an illegal gambling casino that was operated from a converted garage on Lansing Street in Bakersfield. On January 12, 2021,[4] Joanna B.[5] (Alnajar's girlfriend) heard Alnajar tell someone over the phone "that somebody kept taking money and he was tired of it, and that he was going to

---

[4] Subsequent references to dates are to dates in 2021 unless otherwise indicated.

[5] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

go to the spot[6] to see what's going on[.]" Later that night, Alnajar and Joanna drove to the casino to see what was happening.

Alnajar and Joanna arrived at the casino and Alnajar spoke with a woman and told her "that he was tired of . . . of [a] dude taking the money out of the fish machine[.]" Subsequently, Pierce arrived at the casino and "[w]hen he came, everyone, except [Alnajar], went outside so the two of them could talk." Both Alnajar and Pierce spoke for approximately 30 minutes. Joanna was unable to hear what was being said.

Danyell L.[7] first met Pierce in front of a store. Following this interaction, Pierce and Danyell spoke on the phone and communicated via Facebook. On the night of January 13, Pierce called Danyell and told her he needed a ride; Danyell agreed to give him one. She drove Pierce to a location on Chester W. Nimitz ("Nimitz") Street in Bakersfield and dropped him off.[8] Approximately, three to four minutes later, Pierce returned in a white Toyota Scion; Danyell had never seen this vehicle before. He told Danyell, " 'I'll be right back.' "

Approximately 10 to 15 minutes later, Pierce called Danyell and told her to " 'Drive up' " four to five houses on Nimitz street. She drove up and observed Pierce and a non-white male with a beard walk out of a driveway. Pierce then got into Danyell's maroon Kia Optima.[9] Danyell testified his demeanor appeared "normal . . . so it wasn't

---

[6] The "spot" was the Lansing Street casino.

[7] Danyell was an uncooperative witness and claimed to not remember numerous details of the night of the murder. She further testified inconsistently with statements she made to detectives during her January 2021 interview.

[8] This location was five to six apartment buildings away from where Alnajar was murdered.

[9] The Kia Optima was registered to Danyell's mother.

5.

really nothing that alarming."[10] She also testified she did not see Pierce with a firearm.[11] Danyell drove him to a gas station at 4010 Wible Road and then to his mother's house on El Alisal Street.

## B. The Murder Scene

At approximately 9:50 p.m., Bakersfield Police Officer A. Haycock responded to an alleged shooting at an apartment complex ("Apartments") at 1718 Panama Lane in Bakersfield. The Apartment complex is "large . . . [and] on the corner of Panama Lane and South H Street." The Apartments had "several different ways of entry, including alleys that run [to] the north and to the west side of it. There's also a parking lot on the west side of it, which is where [Officer Haycock] stopped [his] patrol vehicle . . . [and] located [Alnajar]." Nimitz Street is west of the Apartments and runs north and south. There is "an open walkway that has public access between" Nimitz Street and the Apartments' parking lot.

Alnajar was found dead[12] lying face down near the driver's side of a Chevrolet Impala. Officer Haycock noticed blood "spatter, maybe spitting or as [Alnajar] came to the ground" near the Impala. He also located "blood on the curb next to [Alnajar] and underneath his whole face and upper torso area." There was also a blood trail that went from Alnajar to his white Cadillac Escalade. The Escalade was still running with the key in the ignition and there was blood spatter on the ground near the driver's side. Officers located a cell phone under the driver's door, which had blood spatter on it. Officers also

---

[10] However, in a prior police interview, Danyell told detectives Pierce appeared "jittery."

[11] However, in a prior police interview, Danyell told detectives she did observe Pierce with a firearm in his waistband. After entering the Kia Optima, he told Danyell he needed to "handle something for [his] homeboy." Danyell also asked him, "[W]hy would you be carrying a gun if you got a ankle monitor?"

[12] Alnajar's cause of death was a "[g]unshot wound to the head[.]"

found an expended bullet[13] from a firearm "between the seat belt and the driver's seat" of the Escalade; however, they were unable to locate any expended casings. Detective J. Billdt hypothesized Alnajar "was seated in the driver's seat[] and . . . was shot by [Pierce] . . . on the right side of his face and the bullet exited the left side of his neck." However, no blood was found on the driver's side window. Additionally, officers swabbed the Escalade's interior and exterior for DNA, however, Pierce's DNA was not found.[14]

Further, Detective K. McNabb opined that "[i]n the vast majority of semiautomatic handguns, which have an ejection port on the right side of the gun, [the casings] would eject to the right." Therefore, if the suspect shot Alnajar from the front passenger seat, the ejected casing can "bounce all over the place, but the logical path . . . would be towards the windshield[.]" Detective McNabb further opined "it's not uncommon for suspects to pick up items of evidence before they flee a scene, such as casings."

## C.    Pierce's Arrest

On January 19, officers arrested Pierce at a gas station convenience store. Officer Galvanez ordered Pierce "to step out of the vehicle and show [the officers] his hands." Initially, he "stepped out and appeared to be cooperating[,]" however, he "beg[an] to pull away from [Officer Galvanez's] grasp [¶] [and] attempt[ed] to step forward away from Officer Galvanez." At this point, officers "eventually pushed [Pierce] to the ground and

---

[13] Both parties stipulated "the bullet found in the driver's seat of Mr. Alnajar's vehicle [was] a nine-millimeter bullet."

[14] Specifically, the parties stipulated to the following:

"[T]he Kern Regional Crime Lab ran DNA testing on swabs from the exterior passenger door handle and the interior passenger seat of Alnajar's vehicle. When those swabs were compared to [Pierce's] DNA profile, the results were inconclusive. This means there was not enough statistical data to determine if [Pierce] or anyone else was a contributor."

began [their] handcuffing procedure." "Officer Galvanez informed [the other officers] [Pierce] had a firearm in the front of his sweater pocket." Officers then seized the loaded firearm,[15] along with Pierce's cell phone from inside the vehicle.

### D. Surveillance Footage, GPS Ankle Monitoring, and Cell Phone Data

Law enforcement searched Pierce's phone and discovered multiple text messages between him and Alnajar.[16] Specifically, on January 10, Pierce texted Alnajar, "Bro yo ass owe some bread.[[17]] I c, u get yo lil change and gone. Bro we had to give up some more cash out[.]"

Thereafter, around noon on January 13, there were multiple searches on Pierce's phone "for what is 40 percent of 332." At 7:11 p.m., there was an outgoing call from Alnajar's phone to Pierce's phone that lasted six seconds. At 7:51 p.m., there was an outgoing call from Alnajar's phone to Pierce's phone that lasted 98 seconds.

Subsequently, at 8:39 p.m., Alnajar texted Pierce, "U there yet[?]" At 8:44 p.m., there was an outgoing call from Pierce's phone to Alnajar's phone that last 60 seconds. At 8:55 p.m., Pierce texted Alnajar, "I'm almost there bro, these lights" and Alnajar replied, "Fasho I'm rite here at fast trip[.]"

At 8:50 p.m., GPS monitoring[18] showed Pierce at Teal Street. At 8:53 p.m., a gas station convenience store's surveillance footage, at the corner of Panama Lane and South

---

**15** Both parties stipulated that "[a]fter ballistics testing by the Kern Regional Crime Lab, it was determined the bullet [found in the Escalade] did not match the gun found on [Pierce] on January 19, 2021." This loaded firearm was the basis for counts 2 and 3.

**16** Sergeant D. McClive obtained a search warrant for call detail records of Pierce's cell phone with the phone number of (661) 497-2753.

**17** Detective McNabb testified the phrase, " 'Bro, yo ass owe some bread' " means that Alnajar owed Pierce money.

**18** Pierce wore a GPS tracking device as a condition of his parole. The GPS tracking device "had nine satellites that were in view of it . . . and it used eight of those

H Street, showed Alnajar's Escalade in the parking lot. At 8:56 p.m., Pierce texted Alnajar, "Okay im On my way!" and Alnajar replied, "Fasho[.]" At 9:07 p.m., Alnajar's white Escalade left the gas station convenience store parking lot. Around this same time, Pierce moved south and arrived at the Apartments.[19]

At 9:10 p.m., there was a call from Pierce's phone to Alnajar's phone that lasted 179 seconds. This was the final cell phone communication between Pierce and Alnajar. At 9:11 p.m., Pierce headed south on Nimitz Street. At 9:12 p.m., Pierce headed east towards the Apartments, and then at 9:13 p.m. he headed north – still near the Apartments. At this same time, surveillance footage from the 1701 William F. Halsey Avenue address showed Alnajar's Escalade enter the alley by the Apartments' west parking lot.

At 9:14 p.m., Pierce traveled north but was still at the Apartments. At 9:15:55, Pierce was at the gutter on the east side of Nimitz Street, approximately six or seven buildings north of where Danyell picked him up. Eventually, between 9:20 p.m. and 9:21 p.m., Pierce was at the corner of El Alisal and Teal. At 9:48 p.m., Pierce returned to his mother's house on El Alisal Street and stayed there until midnight.

On January 14, at 8:44 a.m., Pierce received a text message from an individual named Fernando W. asking, "Ay what happened to fish[?]" Within five minutes of receiving the text message, Pierce began "searching [on Google for] man shot in Bakersfield."

_____

satellites to calculate the latitude and longitude" of Pierce's position. A data analyst with Securus monitoring, the company that was responsible for reviewing and certifying Pierce's GPS tracking device data, testified "anything nine and above . . . [constitutes an] excellent cell signal[]." Further, the "Department of Defense's standard for reasonable margin of accuracy is 15 meters, which is approximately . . . 50 feet." Pierce's location between 8:50 p.m. and 9:48 p.m. is based on this GPS data.

[19] As reflected in People's Exhibit No. 99, Detective McNabb plotted "[t]he points for the latitude and longitude of [Pierce's] [GPS] ankle monitor" between 9:10:57 to 9:15:55.

On January 18, at 7:11 p.m., Fernando sent Pierce a photograph of the following three firearms: a Glock semiautomatic, a Remington LC9 semiautomatic firearm, and a replica Glock or Polymer80-style firearm (People's Exhibit No. 88). Pierce replied, "Wat they want[?]" Fernando asked, "For which one[?]" and Pierce responded, "Any of them[.]" Fernando replied, "900 and 1100 [¶] Middle and right[.]" Law enforcement also discovered a photograph on Pierce's phone of the same photograph reflected in People's Exhibit No. 88, with the Glock semiautomatic circled (People's Exhibit No. 89).

Pierce's phone also contained various photographs that were taken on December 24 and 25, 2020 – specifically, a Glock firearm on someone's lap (People's Exhibit No. 82); a firearm with an extended magazine (People's Exhibit No. 83); and a Glock 19 firearm (People's Exhibit No. 84).[20] Officer R. Clark, who testified as a firearm expert, testified the Glock 19 firearm shown in People's Exhibit No. 84 was a nine-millimeter semiautomatic pistol that uses nine-millimeter ammunition.

### E. Post-Arrest Communications

#### 1. *Jail Calls*

Veronica M., who testified under a use immunity agreement, was a friend of both Danyell and Joseph Gage. On May 18, inmate George Chavez called Veronica from jail. The following relevant exchange occurred between Chavez and Veronica:

> "CHAVEZ: I got a message for you. Alright? I'm going to read it as best as I can to you. If you can, please pay attention to it. Um, it's from somebody, he's going to try to call you later on. He said just talk baseball. Right? Look, this is it. It says, before I get into it, make sure when you figure out the girl I'm talking about, make sure you don't say her name. Just say the sister. Okay. It says VV look, tell your friend, Kelby's sister[21] that she needs to be quiet. She's doing too much talking to that

---

[20] Detective McNabb testified the firearm depicted in People's Exhibit No. 84 was a Glock 17 firearm. However, firearm expert Officer Clark clarified the firearm was actually a Glock 19.

[21] Kelby's sister is Danyell.

person, Sin's brother. The only reason she don't like that is because I didn't want another female to pull up knowing what kind of car I was in because I told them I was going to the hotel room, but I chilled with her instead. VV tell old girl she better not get it down like that and she knows damn well I didn't do shit while I was with her. Um, do you still fuck with [Joseph] Gage?"

"[VERONICA]: Of course. That's my [unintelligible]."

Subsequently, on May 19, Pierce called Veronica directly from jail. The following relevant exchange occurred between Pierce and Veronica:

"PIERCE: What – what did they say when you talked to them?

"[VERONICA]: She sat real quiet and she said, 'I ain't, I ain't talking to nobody.' And she just sat real quiet. And then she was like . . . I said, 'Well, you know I don't fuck with [Pierce] like that.' But you know at the end of the day, she's still a homegirl and I'm going to let her know. You know?

"PIERCE: But yeah, it's good. I don't want her to say shit, I don't want nobody to know, nothing . . . about . . . that situation. You know?

"[VERONICA]: Yeah.

"PIERCE: So I don't know what's going on.

"[VERONICA]: Yeah, yeah, yeah. I hear you. Joseph said he got at her already about it too though."

At trial, Veronica admitted she had told Chavez she would relay the message from Pierce to Danyell. She further testified she had already spoken with Danyell when Pierce called her. Additionally, she further admitted that Pierce told her to tell Danyell that "[s]he's talking too much."

### 2. Kite

On March 28, 2023, Kern County Deputy Sheriff S. Ramirez observed Pierce, who was in custody, "pass an unknown object at the time to another inmate." Deputy

11.

Ramirez believed Pierce passed a "kite"[22] to another inmate, Kevin Dixon; however, he did not physically see Pierce with the kite. He then retrieved the kite from Dixon and provided it to the Kern County District Attorney. The front of the kite read as follows:

> "G Money, aye bro, this D.A. bitch on some bullshit. All you got to say is that we was in the same building. I bought a drawing from you. You read about my case when it was in the news paper. Let them no that I have never told you or talked much about my case, and I've never had you call anyone talkin bout my case. If it wasn't Lea, then you was doin a favor for some one else. Lea is the only person you have called for me. Also say this in 2021, you was around two DK. Not just me."

The back of the kite read as follows:

> "If the D.A. keep askin you shit, tell her you don't know much about me. But regardless of anything, I've never told you to call and threaten nobody, or have anybody else threaten anybody."

**F.    Jury Visit**

On August 3, 2023, the jury traveled to the murder scene. The trial court placed the following on the record:

> "[W]e did go out to the scene this morning. About one hour out, at 9:25 or so. We left, got back about 10:28. And I did set the record already for how the caravan was.

> "So when we pulled in off of South H, we made a right into the alley, heading west. To our right was the testimony from [the resident at 1701 William F. Halsey Avenue] where his camera was. The jury had the opportunity to see that. We then went westbound in the alley and then made a left heading southbound. We stopped in the area where the testimony was that the Escalade was located. For the record, while there, there was a blue fish painted on the cement roughly in that area.

> "We then pulled up again heading southbound to the area where the testimony was that the victim was found southeast of where the Escalade was. We then continued further into the alley, looking to the right of the breezeway that was testified to, which is about two-thirds of the way down

[22] Deputy Ramirez testified "[a] kite is a type of communication that inmates use, usually found in smaller pieces of paper to hide from officers."

12.

the alley from the turn before we get to Panama. And then we pulled up to Panama Lane, and everyone had a chance to look to the left and see the [gas station convenience store].

"I might add that when we started in the alley back at [the 1701 William F. Halsey Avenue] place, we could also see the [gas station convenience store] from there. So back on Panama we made an immediate right turn, and then the first right turn onto [Nimitz] where we saw the area of where [Danyell] testified she was parked. We then slowly pulled up [Nimitz] into the area before right at and after Spruance, where we had testimony of roughly where [Danyell] testified she picked up [Pierce], where we saw the – or where also the third party was seen.

"We then pulled up to Halsey. I exited the van, and we all came back to court."

## II. Defense's Case-in-Chief

### A. S. Diaz's Testimony

On January 13, between 9:30 p.m. and 9:50 p.m., S. Diaz was watching television in her apartment on Nimitz Street when she heard a male and female arguing. She then heard two gunshots followed by movement; however, she did not observe anyone fleeing from the area. A minute after hearing the two gunshots, Diaz looked out her window and observed a white vehicle with its door open and blood on the ground. Diaz further testified "there was a walkway that you [could] go [from Nimitz]" Street to the alleyway.

### B. Public Defender Investigator T. Schweer

Investigator Schweer, a senior investigator with the Kern County Public Defender, did not observe tattoos on Pierce's arms or wrists. She opined he was not the individual pictured in People's Exhibit No. 82 because the pictured individual had tattoos on his arms. Further, on February 7, 2022, Investigator Schweer went to the "alleyway between the two apartments on Panama and South H and the ones on . . . Nimitz . . . [and] took photographs of the alleyway between those two apartments." Thereafter, on August 2, 2023, she returned to the scene to "look at the area and review any kind of access ways between the alleyway to . . . Nimitz." She testified there were no straight pathways from

13.

Nimitz Street to the alley and the only access was through a "zigzag way." Furthermore, she testified the fence along the pathway was taller than her height of five feet, five inches and would be difficult for her to jump over.

## DISCUSSION

### I.  Substantial Evidence Supports the First Degree Murder Conviction

Pierce contends "[t]he record reflects that the prosecution's theory was flawed and based on insufficient evidence to prove [he] was the perpetrator beyond a reasonable doubt . . . and the speculative inferences advocated by the prosecution are insufficient to support [his] conviction in this case." We disagree.

#### A.  Standard of Review

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 (*Lindberg*).) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57 (*Brooks*).)

Thus, " '[i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) We may reverse a conviction for lack of substantial

14.

evidence only if it appears " ' "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

**B.    Applicable Law**

Murder is the "unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  A "willful, deliberate, and premediated killing" is first degree murder. (§ 189, subd. (a).)  " ' "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.' [Citation.] 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides . . . which are the result of mere unconsidered or rash impulse hastily executed.' " (*Brooks*, *supra*, 3 Cal.5th at p. 58.)

"*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 [(*Anderson*)] identified three categories of evidence relevant to deciding whether to sustain a verdict of first degree murder based on premeditation and deliberation: (1) evidence of planning activity prior to the killing, (2) evidence of the defendant's prior relationship with the victim from which the jury could reasonably infer a motive to kill, and (3) evidence that the manner in which the defendant carried out the killing 'was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from the facts of type (1) or (2).' " (*Brooks*, *supra*, 3 Cal.5th at pp. 58-59.)

"The identified categories of evidence are those [our Supreme Court] ' "typically" find[s] sufficient' to uphold first degree murder convictions.  [Citation.]  But [our Supreme Court] ha[s] also observed that the *Anderson* factors are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the

15.

killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' " (*Brooks*, *supra*, 3 Cal.5th at p. 59.) Further, " '[e]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87 (*Manibusan*).)

### C. Analysis

Pierce's primary argument is centered around a lack of substantial evidence regarding his identity as the shooter, rather than the nonexistence of premeditation and deliberation during the killing. Although both parties agree Pierce was in the vicinity of where the murder took place, Pierce argues "[n]o one witnessed the shooting[;] [t]here was no surveillance video or eyewitness placing [him] at or in the Escalade [and] [t]he DNA and fingerprint evidence located in the Escalade and around the scene did not connect [him][;] [and] [n]one of the firearms depicted in the photographs on [his] phone or the one found in his possession when he was arrested were found to be connected to the murder." However, when considering the evidence in support of Pierce as the shooter, we conclude substantial evidence exists to support the jury's finding that Pierce shot and killed Alnajar with premeditation and deliberation.

#### 1. *Evidence of Identity*

As noted above, both parties agree Pierce was in the vicinity of where the murder took place. Specifically, GPS tracking and Pierce's cell phone usage showed him in the area of the Apartments between 9:07 p.m. and 9:15:55 p.m., and around this same time, surveillance footage from the 1701 William F. Halsey Avenue address showed Alnajar's Escalade enter the alley by the Apartments' west parking lot. Further, before and during the murder, the evidence established that Pierce and Alnajar were business partners in an illegal gambling casino and had been communicating via text message between January 10 until January 13 at 9:10 p.m. This business partnership soured based on an

16.

apparent dispute between Pierce and Alnajar over money, which provided Pierce motive for the killing.

Additionally, Pierce's subsequent actions provided substantial evidence to support the jury's finding he was the murderer. First, Danyell told law enforcement that he appeared "jittery" when she picked him up and also observed him with a firearm in his waistband. Pierce also told Danyell he had to "handle something for [his] homeboy." Second, on January 14, Fernando texted Pierce, "Ay what happened to fish[?,]" which resulted in Pierce beginning to "search[] [on Google for] man shot in Bakersfield." Third, Pierce directed Chavez via a jail phone to Veronica to "tell [her] friend . . . [Danyell] that she needs to be quiet." He also called Veronica directly and told her, "I don't want [Danyell] to say shit, I don't want nobody to know nothing . . . about . . . that situation." Lastly, Pierce used a "kite" to try to convince Dixon to "[l]et them no that [he] have never told you or talked much bout [his] case, and [he] never had you call anyone talking about [his] case." Further, he went on to say that "regardless of anything, [he] never told [Dixon] to call and threaten nobody, or have anybody else threaten anybody." The jury could infer from Pierce's subsequent actions that he was nervous he was going to be caught and thus attempted to try to dissuade others from speaking with law enforcement about his case. Accordingly, Pierce's business partnership and constant communication with Alnajar, his presence at the scene of the murder at or near the time the murder took place, and his subsequent actions all provided substantial evidence to establish he was the individual who shot and killed Alnajar.

Because we conclude substantial evidence supports the jury's finding Pierce was the shooter, we now analyze the *Anderson* factors to determine whether the killing was done with premeditation and deliberation.

###   2.   *Planning Activity*

Planning activity considers "facts about how and what [the] defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward,

17.

and explicable as intended to result in, the killing[.]" (*Anderson*, *supra*, 70 Cal.2d at p. 26, italics omitted.) Here, on the night of January 13, Pierce called Danyell and told her he needed a ride; Danyell agreed to give him one. She drove him to the Apartments on Nimitz Street and dropped him off at 9:07 p.m. Approximately three to four minutes later, Pierce returned in a white Toyota Scion and told Danyell, " 'I'll be right back.' " Subsequently, according to Danyell, she observed Pierce with a firearm in his waistband, and he told her he had to "handle something for [his] homeboy." The jury could have reasonably concluded that Danyell drove Pierce to ensure he had a quick getaway driver once he completed the murder. Further, the jury could have reasonably determined that Pierce brought a firearm with him in order to ensure he had the means to carry out the murder. Based on the facts from this record, the jury had sufficient evidence to find that Pierce planned to kill Alnajar.

### 3. *Motive*

Motive considers "facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim[.]" (*Anderson*, *supra*, 70 Cal.2d at p. 27, italics omitted.) Here, Pierce and Alnajar were business partners in an illegal casino operating out of a converted garage. On January 10, Pierce texted Alnajar, "Bro yo ass owe some bread." Alnajar was then informed "that somebody kept taking money and we was tired of it, and that he was going to go to the [casino] to see what's going on[.]" On January 12, both Alnajar and Pierce arrived at the casino and spoke alone for approximately 30 minutes.

Subsequently, on January 13, Pierce repeatedly searched on his phone "what is 40 percent of 332." At 7:51 p.m., he called Alnajar and they spoke for 98 seconds. Between 8:39 p.m. and 9:07 p.m., Alnajar texted Pierce about his whereabouts. Up until 9:07 p.m., Pierce repeatedly lied and told Alnajar he was on his way when he in fact remained in the area of Teal Street.

18.

A reasonable juror could infer that Pierce and Alnajar had a dispute over money, and that there was an agreement to meet at the casino to potentially resolve this dispute. This dispute is corroborated by the fact Pierce told Alnajar, "Bro yo ass owe some bread" and that Alnajar had a conversation wherein he was informed "somebody kept taking money[.]" However, it appears that even after this 30-minute meeting this money dispute remained unresolved. At this point, it is reasonable to infer that in order to resolve this dispute, Pierce formulated a plan to kill Alnajar. To ensure Alnajar did not become suspicions of his nefarious intent, Pierce repeatedly told him he was on his way while actually he remained in the area of Teal Street. Based on this money dispute and Pierce's frustration with Alnajar in that he owed him money, a motive to kill can be readily inferred from the record.

### 4. *Manner of Killing*

The manner of killing looks to the "facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts" of both the planning activity and motive. (*Anderson*, *supra*, 70 Cal.2d at p. 27, italics omitted.) For example, our Supreme Court in *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254 (*Gonzales and Soliz*), found "[t]he manner of killing – a close-range shooting without any provocation or evidence of struggle – additionally supports an inference of premeditation and deliberation." (*Id*. at p. 295; see *People v. Marks* (2003) 31 Cal.4th 197, 230 (*Marks*) [Holding "a close-range shooting without any provocation … or evidence of struggle, likewise demonstrates premeditation and deliberation"]; see also *People v. Bloyd* (1987) 43 Cal.3d 333, 348 [Because the victim was shot in the head "execution-style" at point-blank range without evidence of struggle, this evidence supported a first degree murder conviction].)

19.

Here, Detective Billdt hypothesized that Alnajar "was seated in the driver's seat[] and . . . was shot by [Pierce] . . . on the right side of his face and the bullet exited the left side of his neck." There was no evidence of provocation or struggle, and thus, it was reasonable for the jury to infer that Pierce shot Alnajar at "close-range … without any provocation[.]" (*Marks*, *supra*, 31 Cal.4th at p. 230.) Therefore, this "close-range shooting without any provocation or evidence of struggle … supports an inference of premeditation and deliberation." (*Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 295.) Accordingly, when analyzing the *Anderson* factors, substantial evidence exists to support the jury's finding Pierce shot and killed Alnajar with premeditation and deliberation.[23]

## II.     The Trial Court's Admission of the Firearm Photographs

Further, Pierce contends "[t]he trial court abused its discretion in allowing the prosecution to admit photographs of firearms that were not connected to the charged offenses along with a law enforcement witness' opinion that some of those photographs depicted a nine-millimeter pistol [because] [t]he evidence was irrelevant and thus inadmissible in this case." As we discuss in detail below, the trial court did not abuse its discretion in admitting photographs of firearms that were created on December 24, 2020 (People's Exhibit Nos. 82, 83, & 84), approximately three weeks before the murder, because it was proper to introduce evidence Pierce " 'possessed a gun that *might* have been the murder weapon[.]' " (*People v. Sanchez* (2019) 7 Cal.5th 14, 55, (*Sanchez*), italics added.) Further, the trial court did not abuse its discretion in admitting photographs of firearms that were created on January 18 (People's Exhibit Nos. 88 & 89),

---

**23** Nonetheless, Pierce argues "[t]he prosecution's case against [him] was based solely on circumstantial evidence" and asks this court to reweigh the evidence presented against him. As noted above, " 'circumstantial evidence is as sufficient as direct evidence to support a conviction' " (*Manibusan*, *supra*, 58 Cal.4th at p. 87) and we do not reweigh evidence on appeal. (*Lindberg*, *supra*, 45 Cal.4th at p. 27.) Therefore, as discussed above, we have already concluded the jury could have reasonably inferred from the circumstantial evidence that Pierce shot and killed Alnajar with premeditation and deliberation. Accordingly, substantial evidence supports the jury's verdict.

five days after the murder, because this evidence established Pierce's desire to purchase a new nine-millimeter firearm after getting rid of the murder weapon.

## A.     Additional Factual Background

During Detective McNabb's testimony, trial counsel objected to certain photographs of firearms the prosecutor attempted to introduce.  The trial court conducted a hearing outside the presence of the jury and the following relevant exchange occurred between the trial court, prosecutor, and trial counsel:

> "[TRIAL COURT]: During the break I did have the opportunity to look over the photographs that [trial counsel] was objecting to.  Apparently, they're photographs of various firearms, primarily handguns, some of them with extended magazines in them.  I do remember seeing those in opening.
>
> "[Trial counsel], your objection?  Go ahead.
>
> "[TRIAL COUNSEL]:  Yes.  The defense would be objecting.  The photographs were taken, some time, before – some of them were some time before the date of January 13th, 2021.  Defense's contention that it is irrelevant.  None of those guns have been seized, tested, and connected to the offense.  The offense we're speaking of is the murder of Mr. Mubarek Alnajar, the decedent.
>
> "Furthermore, [Pierce] is charged with one count of possessing a firearm by a felon.  That charge arises from the date that he was arrested.  Defense's contention is that introduction of photographs of other guns that were located on [Pierce's] cell phone is more prejudicial than probative and completely irrelevant.
>
> "[TRIAL COURT]:  [Prosecutor], do I recall something about the fact that there were text messages regarding getting a firearm from somebody else?
>
> "[PROSECUTOR]:  Yes, Judge.  The – the photos – the first three guns are from December 24th and December 25th; so about two and a half, three weeks prior to the homicide.  One of them is a nine-millimeter, which shockingly [Pierce] used a nine-millimeter to kill Mr. Mubarek Alnajar.
>
> "And then the photo of the three, after he got rid of the murder weapon on the 18th, five days after the homicide, he's texting with his friend Fernando, who is his gun dealer, about how much the middle one cost, which is another nine-millimeter, and how much the one on the right cost.

21.

He's then found with yet another gun on the 19th; so I think it's incredibly probative and relevant, these guns, that [Pierce] has access to over seven different handguns – excuse me, six handguns, one assault rifle, in the few weeks before and after the homicide, specifically given the fact that we did not find the murder weapon, and so I think absolutely they're relevant and should be admitted.

"[TRIAL COURT]: Okay. Your objection is noted. Overruled, [trial counsel.]

"The photographs will be admitted."

At trial, the following photographs created or taken on Pierce's cell phone *before* the murder were introduced as follows:

People's Exhibit No. 82: A photograph of an individual[24] with a Glock firearm that had a 'muzzle break'[25] created on December 24, 2020, at 7:52:57 p.m.

People's Exhibit No. 83: A photograph of a pistol with a rifle attachment created on December 24, 2020, at 7:51:07 p.m.

People's Exhibit No. 84: A picture of a Glock 17[26] firearm created on December 24, 2020, at 7:53:01 p.m.

The following photographs created or taken on Pierce's cell phone *after* the murder were introduced as follows:

People's Exhibit No. 88: A photograph showing three semiautomatic firearms: on top is a replica Glock or Polymer80-style firearm; in the middle is an LC9 Ruger; and on the bottom is a Glock created on January 18, 2021, at 7:11:01 p.m.

---

[24] Investigator Schweer testified she did not observe any tattoos on Pierce's arms and wrists, and thus, opined the individual depicted in People's Exhibit No. 82 was *not* Pierce. However, trial counsel never raised this potential foundational issue during the parties' discussions regarding the admissibility of People's Exhibit No. 82 and furthermore, Pierce did not raise this issue in his opening brief. Accordingly, we do not address any potential foundational argument regarding Exhibit No. 82 in this appeal.

[25] A muzzle break "essentially lessens the flash that would come from a firearm."

[26] Officer Clark testified he "believe[d] that this [firearm] is a Generation 4 Glock 19 9mm semiautomatic pistol."

People's Exhibit No. 89:  A photograph showing the same three semiautomatic firearms as depicted in People's Exhibit No. 88, with the Glock on the bottom circled, created on January 18, 2021, at 8:25:51 p.m.

## B.    Standard of Review

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  " '[P]rejudicial' " as used in Evidence Code section 352 "is not synonymous with 'damaging,' but refers instead to evidence that ' "uniquely tends to evoke an emotional bias against [the] defendant" ' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

"The trial court has broad discretion to determine the relevance of evidence [citation], and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner [citation]."  (*People v. Jones* (2013) 57 Cal.4th 899, 947 (*Jones*).)

## C.    Applicable Law

In *People v. Riser* (1956) 47 Cal.2d 566, 577 (*Riser*), overruled on another ground in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2), our Supreme Court held:

> "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed.  There need be no conclusive demonstration that the weapon in [the] defendant's possession was the murder weapon. [Citations.]  When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Riser*, *supra*, 47 Cal.2d at p. 577.)

For example, in *Sanchez,* "the [trial] court admitted evidence that [the defendant] possessed a firearm around the time of the murders."  (*Sanchez*, *supra*, 7 Cal.5th at p. 55.)

23.

Our Supreme Court reiterated the *Riser* rule "that it is generally error to admit evidence that the defendant possessed a weapon that could not have been the one used in the charged crime[;]" however, the court concluded the "rule does not apply here." (*Ibid.*) Specifically, the *Sanchez* court stated the following:

> "Here, the murder weapon was never found, but the evidence showed it was likely a nine-millimeter firearm. The firearm the witness testified about could easily have been the one used in the murders. 'Although the witnesses did not establish the gun necessarily was the murder weapon, it might have been. Unlike [*Riser*], *supra*, 47 Cal.2d at p. 577, this evidence did not merely show that [the] defendant was a person who possesses guns, but showed he possessed a gun that might have been the murder weapon[.] The evidence was thus relevant and admissible as circumstantial evidence that he committed the charged offenses.' " (*Sanchez*, *supra*, 7 Cal.5th at p. 55.)

### D.      Analysis

The prosecutor introduced photographs that were created on December 24, 2020 (People's Exhibit Nos. 82, 83, & 84) and photographs that were created on January 18 (People's Exhibit Nos. 88 & 89). We examine the introduction of the photographs created *before* the murder (People's Exhibit Nos. 82, 83, & 84) separately from the photographs created *after* the murder (People's Exhibit Nos. 88 & 89).

#### 1.      *People's Exhibit Nos. 82, 83, & 84*

Here, the trial court did not abuse its discretion when it admitted People's Exhibit Nos. 82, 83, and 84 pursuant to Evidence Code section 352. These pictures were taken on December 24, 2020 – approximately three weeks *before* the murder. Although it was unclear whether one of the firearms depicted in these photographs was the *actual* firearm used to murder Alnajar, all that is required is that Pierce " 'possessed a gun that *might* have been the murder weapon[.]' " (*Sanchez*, *supra*, 7 Cal.5th at p. 55, italics added.) Officer Clark opined the Glock depicted in People's Exhibit No. 84 would fire nine-millimeter bullets – the same type of bullet found inside Alnajar's Escalade. Because "the murder weapon was never found, but the evidence showed it was likely a nine-

millimeter firearm[,] … '[t]he evidence was thus relevant and admissible as circumstantial evidence that [defendant] committed the charged offenses.' " (*Ibid.*) Accordingly, the trial court acted well within its discretion in admitting People's Exhibit Nos. 82, 83, and 84.

### 2.  *People's Exhibit Nos. 88 & 89*

Further, the trial court did not abuse its discretion when it admitted the  People's Exhibit Nos. 88 and 89 pursuant to Evidence Code section 352.  In *Riser*, our Supreme Court concluded that "[w]hen the prosecution relies . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, *but only that he is the sort of person who carries deadly weapons*." (*Riser*, *supra*, 47 Cal.2d at p. 577, italics added.) *Riser* was concerned with a prosecutor introducing "weapons evidence" as improper propensity evidence.  However, if the prosecution can point to a limited purpose for why the "other weapons" evidence is relevant, then this type of evidence may be admissible.

Here, the prosecutor argued that "after [Pierce] got rid of the murder weapon on the 18th, five days after the homicide, he's texting with his friend Fernando, who is his gun dealer, about how much the middle [firearm] cost, which is another nine-millimeter" firearm.  During the prosecutor's closing argument, she argued that Pierce texts Fernando regarding the purchase of a new nine-millimeter firearm "[b]ecause he had gotten rid of the gun he used to kill [Alnajar]."  Therefore, this evidence was probative because it established Pierce's desire to obtain a new nine-millimeter firearm after getting rid of the murder weapon.  Because "[t]he trial court has broad discretion to determine the relevance of evidence [citation], and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner" (*Jones*, *supra*, 57 Cal.4th at p. 947), we conclude the trial court did not abuse its discretion when it found this evidence admissible pursuant to Evidence Code section 352.

25.

### 3. *Prejudice*

Nonetheless, even if the trial court erred in admitting the firearm evidence, we conclude the error was harmless. As it relates to prejudice, "the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of [*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)]."[27] (*Marks*, *supra*, 31 Cal.4th at pp. 226-227.) "*Watson* instructs a reviewing court to ask whether there is a reasonable probability the jury might have reached a different result had it been instructed correctly. [Citation.] In other words, *Watson* asks the court to imagine what the jury would have done in the counterfactual world in which [the error did not occur]. While the court should undertake that task in light of the ' "entire cause, including the evidence" ' [citation], the reviewing court should focus solely on whether 'the error affected the outcome' [citation], not on whether the court personally believes that outcome was correct." (*People v. Hendrix* (2022) 13 Cal.5th 933, 948 (*Hendrix*).)

Here, we are unable to conclude Pierce was prejudiced as a result of any presumed error. As discussed *ante* in section I, subdivision (C) of the Discussion, the evidence in support of Pierce shooting and killing Alnajar with premeditation and deliberation was

---

[27] Pierce argues that "[b]ecause the erroneous admission of evidence violated [his] federal constitutional rights to due process and a fair trial, the error should be reviewed under *Chapman* [*v. California* (1967) 386 U.S. 18, 24 (*Chapman*)], requiring the State to show beyond a reasonable doubt the error was harmless." However, "the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of *Watson*, *supra*, 46 Cal.2d at p. 836." (*Marks*, *supra*, 31 Cal.4th at pp. 226-227.) With that being said, our Supreme Court "ha[s] recognized … that Evidence Code section 352 must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of significant probative value to his or her defense." (*People v. Cunningham* (2001) 25 Cal.4th 926, 998-999, italics omitted.) Here, as we discuss in further detail in section III of the Discussion, Pierce had the right to present all *relevant* and *admissible* evidence in his defense. Accordingly, the appropriate standard to apply to this case is the *Watson* standard of prejudice.

strong. First, Pierce's actions immediately before and during the murder established his guilt. Pierce and Alnajar had a prior business partnership, and the record establishes Pierce had a motive to kill Alnajar because he was frustrated Alnajar owed him money. On the night of the murder, Pierce called Danyell and had her drive him to the area of the Apartments. She later told law enforcement she observed Pierce with a firearm in his waistband and heard him tell her he had to "handle something for [his] homeboy." GPS monitoring and cell phone data placed Pierce in the area of the murder between 9:07 p.m. and 9:15:55 p.m.

Second, Pierce's actions after the murder established his guilt. After receiving a text message from Fernando asking what happened to Alnajar, he immediately began "searching [on Google for] man shot in Bakersfield" to determine the extent of law enforcement's investigation. Further, Pierce contacted Veronica both indirectly and directly to try to get her to convince Danyell to stop talking with law enforcement. Finally, Pierce contacted a jail mate, Dixon, via a "kite" and told Dixon to not speak with anyone about Pierce's case. Accordingly, based on his conduct both before and after the murder, there is no "reasonable probability" Pierce would have received a different result from the jury had the photographs not been introduced. (*Hendrix*, *supra*, 13 Cal.5th at p. 948.)

Nonetheless, Pierce argues the prosecutor's comments during closing arguments regarding the January 18 photographs "created a strong potential of confusing the jury, creating impermissible speculation, and evoking emotions to taint their view of [him] to improperly dilute the otherwise existing reasonable doubt the lack of forensic and eyewitness evidence would have raised[.]" Specifically, the prosecutor argued the following during her closing argument:

> "He sends multiple messages with Fernando five days after the homicide, a day before his arrest. Five days after he got rid of that nine-millimeter he used to kill [Alnajar] because he needed a new one. [¶] . . . [¶]

"Because he had gotten rid of the gun he used to kill [Alnajar]. He has access to whatever firearms he wants, when he wants them. Why is he texting someone, as a convicted felon, which how much for these? How much for the middle? How much for the right?

"The middle, what do you know, it's another nine-millimeter. Because he had just gotten rid of the nine-millimeter from January 13th. [¶] . . . [¶]

"And then we have [his] attempts to get new guns from his gun dealer, Fernando. They're talking about how much they are. Middle or the right. The middle, again, is a nine-millimeter semiautomatic.

"And they have this exchange. Again, the importance of which is how easily accessible illegal firearms are to this convicted felon, [Pierce]."

The prosecutor did not mention these messages and photographs during her rebuttal argument.

The prosecutor asked the jury, "Why is [Pierce] texting someone, as a convicted felon, which how much for these? How much for the middle? How much for the right?" and she argued it was "[b]ecause he had gotten rid of the gun he used to kill [Alnajar]" and "the importance of which is how easily accessible illegal firearms are to this convicted felon, [Pierce]." Even if we assume these remarks were intended "to show, not that [Pierce] committed the crime, but only that he is the sort of person who carries deadly weapons[,]" which as we discussed above is improper (*Riser*, *supra*, 47 Cal.2d. at p. 577), we conclude the prosecutor's remarks in a much longer closing and rebuttal argument, and an even longer trial, could not have prejudiced Pierce, especially given the strong evidence of his guilt. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1407 [finding the misconduct was harmless because "the prosecutor's passing remark could not have prejudiced [the] defendant, given the overwhelming evidence of guilt"]; *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057, overruled on another ground in *Stansbury v. California* (1994) 511 U.S. 318, 326-327 [finding the misconduct was harmless because "we do not believe a brief statement of this sort would sway the jury over that long a

28.

period"].) Accordingly, we find any presumed error in the trial court's admission of the firearm evidence was harmless.

## III.    Evidence of Third-Party Culpability and Alnajar's Drug Possession

Pierce further contends "[t]he trial court abused its discretion and violated [his] rights of due process, fundamental fairness in the trial court proceedings, and to present a complete defense by precluding the defense at the outset from presenting third party culpability evidence that involved Alnajar's drug activities, debt owed, and persons who were attempting to collect the debt."  We again disagree.

### A.    Additional Factual Background

In the prosecutor's motions in limine, the prosecutor moved to exclude evidence of third-party culpability.  Trial counsel objected to this motion as follows:

> "It is a possibility in this matter.  There was no one who actually saw the offense that led to the death of Mr. Mubarek Alnajar.  This case is largely based on circumstantial evidence.  In the vehicle in which Mr. Alnajar was present, just before he was killed, there were located certain items of physical evidence.  Specifically, DNA and specifically fingerprints. Neither of those bits of evidence were associated with [Pierce] … after testing was done by the district attorney's crime lab.

> "Defense's contention is that there is certainly circumstantial evidence that there were potentially other individuals or individual who was perpetrator of the crime based on the physical evidence that was seized.  Based on the lack of eyewitnesses who placed [Pierce] at the location, specific location, as to where Mr. Alnajar was murdered, was killed."

The trial court then asked the prosecutor whether the crime lab "figure[d] out who the DNA and fingerprints belonged to on the automobile other than [Pierce] or [Alnajar]?" and the prosecutor replied, "There was a fingerprint found from Luis Massie on the interior rear passenger door, and then there was DNA from Eduardo Alvarez, also from the interior rear passenger door."  The prosecutor further stated, "Other than that, there's no connection of Massie or Alvarez to – to the homicide, nor is there any evidence at all that the victim was shot from the rear passenger seat."

29.

Subsequently, Detective McNabb testified he had conducted a records check and confirmed Massie was in custody at the time of Alnajar's death. Further, he reviewed Alvarez's cell phone's social media and call detail records, and concluded that Alvarez was not in the area during Alnajar's murder. The trial court granted the People's motion to exclude evidence of third-party culpability.

Further, the prosecutor moved to exclude "any 'bad character' of victim, Mubarek Alnajar." Trial counsel objected to this motion as follows:

> "The victim has had a significant criminal history. At the time he was murdered, he was actually on federal probation for a drug offense. He was an individual who did engage in illegal conduct. He was known to carry a weapon, to carry a gun, prior to the date that he was murdered. His carrying and possession of that firearm would have been a violation of the law. That is something that was known to individuals who were familiar with him. Specifically, Joanna[], as noted in the prosecution's moving papers.
>
> "Furthermore, during the course of the investigation, it was determined that he did have possession of drugs. They were located at the crime scene. This would have been a minor law violation but would still allow a connection to be made to the illegal drugs which he used and dealt, Your Honor.
>
> "Furthermore, there is potential evidence – and I'm not certain if defense is going to be able to use it or not – whereby it became known during the course of the investigation that Mr. Alnajar owed a large debt, and individuals that knew Mr. Alnajar had become familiar with the individuals that were trying to collect the debt from him. Again, I'm not certain if this is going to be able to be admitted or even discussed.
>
> "So there is some other issues going on with Mr. Alnajar near at the time that he was murdered, Your Honor."

The prosecutor objected because "[t]his is not a self-defense case [and] [i]f [trial] counsel wants to go with self-defense, then . . . some crimes of violence on the part of the victim become relevant." However, "there certainly is no relevance to [Alnajar] being on probation or having drug convictions in the past [because] [t]hat's absolutely exactly

30.

what character evidence excludes."  The trial court granted the People's motion to exclude character evidence of the victim, but stated it could "revisit it based on how [trial counsel] present[s] [their] case."

## B.     Standard of Review

As noted above, "[w]e review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion.  [Citations.]  Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' "  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

## C.     Applicable Law

" '[T]hird party culpability evidence is admissible if it is "capable of raising a reasonable doubt of [the] defendant's guilt," but … "[w]e do not require that any evidence, however remote, must be admitted to show a third party's possible culpability[.]  [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." '  [Citations.]  '[I]n making these assessments, "courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible [citation] unless its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion [citation]." ' "  (*People v. Prince* (2007) 40 Cal.4th 1179, 1242 (*Prince*), italics omitted.)

Further, Evidence Code section 1101, subdivision (a), prohibits the admission of evidence of a person's character to his conduct on a specified occasion.  However, Evidence Code section 1103, subdivision (a), provides an exception to that rule, stating, "In a criminal action, evidence of the character . . . of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by [s]ection 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity

31.

with the character or trait of character." (Evid. Code, § 1103, subd. (a)(1).) For example, "in a prosecution for a homicide or an assaultive crime where self-defense is raised, evidence of the violent character of the victim is admissible to show that the victim was the aggressor." (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 446, fn. omitted.)

"At common law, the introduction of such character evidence was restricted to a few situations and, when admissible, was limited to evidence of reputation. [Citation.] … With respect to a victim of a crime, the common law established that where self-defense was claimed in a prosecution for a crime involving violence, evidence of the alleged victim's violent and aggressive character could be introduced in support of the claim of self-defense." (*People v. Tackett* (2006) 144 Cal.App.4th 445, 453.)

### D. Analysis

The trial court did not abuse its discretion in excluding evidence of third-party culpability. Here, Pierce argues that "[e]vidence that Aljanar was a drug user, had drugs in his possession at the time of his death, and owed a debt to others who were attempting to collect … [was] relevant to raise reasonable doubt as to whether [he] was the perpetrator of the shooting and to give the jury the full picture of the circumstances." However, trial counsel presented *no* evidence of an individual trying to collect a debt from Alnajar, and the only evidence presented to the trial court was that Alnajar "ha[d] possession of drugs" when he was shot and killed. This simple drug possession evidence, without more, had no connection to a potential third-party and was inadmissible for impeachment purposes.

Furthermore, although Massie's fingerprint and Alvarez's DNA were found in the Escalade, neither Massie nor Alvarez could have committed the murder because Massie was in custody at the time of the murder and Alvarez's call detail records placed him outside the area where the murder occurred. Detective McNabb's testimony regarding Massie and Alvarez's whereabouts foreclosed the possibility that either of them killed Alnajar. Accordingly, the trial court properly granted the People's motion to exclude

32.

evidence of third-party culpability, including Alnajar's drug activity because no " ' "direct or circumstantial evidence link[ed] [a] third person to the actual perpetration of the crime." ' "[28] (*Prince*, *supra*, 40 Cal.4th at p. 1242, italics omitted.)

## IV. Prosecutorial Misconduct Claim

Further, Pierce contends the prosecutor committed misconduct when she argued during her closing arguments "to find [him] guilty . . . [because] there was no evidence anyone else had committed the crime" even after "the [trial] court had granted her in limine motion to exclude third party culpability evidence, over defense objection." (Italics omitted.) Specifically, Pierce argues "the comments were improper sandbagging and/or burden shifting attempts." We again disagree.

### A. Additional Factual Background

As discussed *ante* in section III, subdivision A of the Discussion, the prosecution moved to exclude evidence of third-party culpability in her motions in limine, and after extensive discussion, the trial court granted the People's motion.

Subsequently, during the prosecutor's closing argument, she stated the following:

"You guys heard the evidence, and there is none that it was some strange, unknown homeless person who wasn't there on the 13th, who was only there days after, maybe. You have no evidence it was the possibly white or Hispanic or light-skinned male who was maybe watering his lawn or taking out the trash as [Pierce] jumped through his yard to get back onto Nimitz.

"There is no evidence, let alone beyond a reasonable doubt, that anyone, other than [Pierce], committed this murder.

---

[28] It is also important to note the trial court left open the possibility for trial counsel to introduce additional evidence in support of third-party culpability at a later time during the trial. Specifically, the trial court stated it could "revisit [it] based on how [trial counsel] present[s] [their] case." This was not a case where trial counsel was completely foreclosed from presenting a possible defense, but rather the trial court gave trial counsel ample opportunity to present third-party culpability evidence up until the close of evidence. Accordingly, any claim Pierce's rights to due process and a fair trial were violated are without merit.

Following this statement, trial counsel stated, "I renew my objection[]" and the trial court replied, "The same admonition I gave you this morning.[29] [¶] Overruled." The prosecutor then summarized her case and argued, "How could he not be guilty? [¶] Explain to me the reasonable, alternative interpretation of these facts?" At this point, trial counsel objected for "burden shifting" and the trial court overruled the objection.

Subsequently, during the prosecutor's rebuttal argument, she stated, "[Trial counsel's] investigator went and canvassed and spoke to over 20 people. Yet only one came in to testify, Miss Diaz." Trial counsel objected for "burden shifting" and the trial court overruled the objection based on it being a "[c]omment on the evidence." Further, the prosecutor stated, "Never once was a reasonable alternative given to you, and never once was it said that this defendant didn't do it." Again, trial counsel objected for "burden shifting" and the trial court overruled the objection. Finally, the prosecutor stated the following:

> "Never once was it ever said he didn't do it. I don't have a chart of rainbow colors to show you everything above beyond a reasonable doubt, but there certainly is higher. A hundred percent, beyond all possible doubt. We talked about that weeks ago during jury selection.

> "Why would you kill someone that you're running a business with? Well, if you're sharing profits and you think he's stealing and you kill him, guess what, you don't have to share profits anymore, right?

> "Takes care of the problem.

---

[29] Earlier that morning the trial court instructed the jurors as follows:

"You're the fact finder. Okay? You have listened to all the testimony, and you'll determine what the facts are. The attorneys are arguing the case. Okay?

"While they argue the case, you keep in mind that their argument is not evidence. You're the fact finder. All right?

"That's the admonition I will give you whenever we get that objection. All right?

34.

"There's nothing to indicate anyone was ever inside that passenger side of the victim's vehicle at or near the time of the homicide other than this defendant."

Trial counsel objected based on "no facts to support" and the trial court overruled the objection and stated, "There was a lot of evidence presented there. The jury will make their own decisions."

### B.    Applicable Law

"[A] prosecutor's 'misbehavior "violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citation.] 'Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury.' [Citation.] When, as here, misconduct is asserted 'based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Nadey* (2024) 16 Cal.5th 102, 156 (*Nadey*).)

" ' "Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence." ' " (*People v. Fayed* (2020) 9 Cal.5th 147, 207.) Prosecutors have wide latitude in closing argument to comment on the evidence and reasonable inferences based on the evidence. (*People v. Leon* (2015) 61 Cal.4th 569, 606.) They are not required to discuss violent crimes "dispassionately or with philosophic detachment." (*Ibid.*) However, " ' "[i]t is . . . improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information of inflammatory rhetoric that diverts the attention from its proper role, or invites an irrational, purely subjective response.' " ' " (*Id.* at pp. 605-606.)

Further, "[c]ase law has also firmly established that prosecutorial argument about absent witnesses does not infringe a defendant's rights under *Griffin v. California* (1965)

380 U.S. 609. Interpreting the Fifth Amendment privilege against self-incrimination, '*Griffin* held that "the prosecution may not comment upon a defendant's failure to testify on his or her own behalf. Its holding does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses." ' " (*Nadey*, *supra*, 16 Cal.5th at p. 157.)

For example, in *People v. Steskal* (2021) 11 Cal.5th 332, the defendant did not call his wife to testify about why he " 'all of a sudden . . . decided to act out' " on the day of the murder. (*Id*. at p. 350.) In closing argument, the prosecutor pointed out the lack of evidence supporting the defense on this issue, noting " 'the person that was perhaps the best witness to talk about the defendant before the murder and after the murder, who I can't call because of the marital privilege, they don't call. They don't call [the defendant's wife].' " (*Ibid*.) Our Supreme Court rejected the defendant's prosecutorial misconduct claim based on long standing case law that has "held that a prosecutor may make ' "comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses." ' " (*Id*. at p. 351.) However, the court also made clear the argument is improper if it invites speculation, suggests the defense has the burden to prove innocence, lightens the prosecution's burden, or suggests a defendant may not " 'simply stand[] on his right to have the state prove his guilt[.]' " (*Id*. at p. 352.)

### C. Analysis

Here, Pierce argues that it was "improper, unfair, and 'clearly misconduct' for [the] prosecutor to successfully exclude evidence and then suggest in closing argument that the evidence was not admitted because it did not exist." As discussed *ante* in section III, subdivision (D) of the Discussion, Pierce had ample opportunity to present evidence related to the theory that an individual was attempting to collect a debt from Alnajar. The trial court provided trial counsel the ability to introduce this type of

evidence up until the close of evidence.  However, trial counsel never again mentioned the existence of this type of evidence to the trial court.  Because "[a]ppellate jurisdiction is limited to the four corners of the record on appeal" (*In re Carpenter* (1995) 9 Cal.4th 634, 646), we are unable to conclude this third-party culpability evidence exists.[30] Therefore, due to the nonexistence of third-party culpability evidence, the prosecutor was well-within her right to comment on " ' "the failure of the defense to introduce material evidence or to call anticipated witnesses." ' " (*Nadey*, *supra*, 16 Cal.5th at p. 157.)

Nonetheless, Pierce refers this court to *People v. Roberts* (2021) 65 Cal.App.5th 469 (*Roberts*) and *People v. Frohner* (1976) 65 Cal.App.3d 94 (*Frohner*) in support of his contention.  We find both *Roberts* and *Frohner* distinguishable from the facts of this case.  In *Roberts*, the prosecutor committed two instances of misconduct, which the court described as "unacceptable and must not be repeated." (*Roberts*, at p. 482.)  First, "[t]he prosecutor inaccurately described the presumption of innocence [when] [h]e told the jury during closing argument that although [the] defendant was presumed innocent, 'that presumption lifts as soon as the evidence supporting it lifts . . . . When you come in here and you see that he's charged with a crime, that's not evidence; so he's presumed innocent.  The moment the first witness testifies, now that presumption is starting to lift.' " (*Roberts*, at p. 481.)  The court concluded, "That is incorrect.  It is well established that the presumption of innocence continues into deliberations . . . [and] [t]elling jurors that the presumption of innocence 'is starting to lift' from 'the moment the first witness testifies' is a significant mischaracterization of the law." (*Ibid*.)

---

[30] If, at a later time, Pierce becomes aware of new evidence that can corroborate his third-party culpability theory, he has the ability to file a petition for habeas corpus. (See § 1473, subds. (b)(1)(C)(ii), (e) [" '[N]ew evidence' means evidence that has not previously been presented and heard at trial and has been discovered after trial [¶] [and] that could not have been previously known by petitioner with due diligence"].)  However, there is no guarantee Pierce would be successful in a potential habeas petition.

Second, the prosecutor made a "misstatement of facts in closing argument regarding whether injuries to [the] defendant's girlfriend were serious enough to require treatment at a hospital." (*Roberts*, *supra*, 65 Cal.App.5th at p. 481.) However, "[t]he prosecutor knew the victim did not go to the hospital after the incident – she was arrested later that day on an outstanding warrant." (*Ibid.*) "[T]he jury had no way of knowing that, specifically because the prosecution had successfully moved to exclude evidence of her arrest[,] [but] [t]he prosecutor nonetheless suggested to the jury that the injuries were relatively serious, stating 'we don't know if [she] went to the hospital'[–][k]nowing there had been no hospital visit[.]" (*Ibid.*, italics omitted.) The court concluded "it was clearly misconduct to suggest the possibility to the jury." (*Ibid.*)

Further, in *Frohner*, the prosecutor "fail[ed] to undertake reasonable efforts in good faith to locate [a material defense witness]" – an informant for the prosecution. (*Frohner*, *supra*, 65 Cal.App.3d at p. 108.) The prosecutor then stated during closing argument, "Counsel has subpoenas. If he wanted [the witness] here so you could look at him, he could have had him here." (*Frohner*, *supra*, 65 Cal.App.3d at p. 108, italics omitted.) The court concluded "[t]he prosecutor's comment was inexcusable [because] [h]e knew that subpoenas could not be served on [the informant] [and] [t]he only apparent reason for the comment was an improper one: to suggest to the jury that [the] defendant had purposely failed to call [the informant] as a witness." (*Id.* at p. 109.)

Both *Robert* and *Frohner* stand for the proposition that it is improper for a prosecutor to make false statements to a jury they *know* are false. Here, as mentioned above, there was no indication in the evidence there was a viable third-party who had the motive, means, and opportunity to kill Alnajar. Although there was brief mention of homeless individuals within the crime scene area, along with Danyell's testimony regarding Pierce walking out of the driveway with a non-white male with a beard, there was *no* direct or circumstantial evidence linking anyone else to the murder other than Pierce. (See *Prince*, *supra*, 40 Cal.4th at p. 1241.) Based on this lack of evidence, the

38.

prosecutor's comment on the state of the evidence was proper and did not involve any false statements. Accordingly, the prosecutor did not commit misconduct when she mentioned this lack of evidence during her closing argument.

### D. Prejudice

However, even were we to assume the prosecutor's comments during her closing argument constituted prosecutorial misconduct, we find that any misconduct was harmless. As discussed *ante* in section I, subdivision (C) of the Discussion, evidence that Pierce shot and killed Alnajar was strong. Further, these few remarks could not have prejudiced Pierce when they were made amongst a longer closing argument, and during a lengthy trial that lasted for nearly a month. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1344.) Accordingly, there is not " 'a reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion.' " (*Nadey*, *supra*, 16 Cal.5th at p. 156.)

## V. Cumulative Prejudice

Lastly, Pierce contends that "if this Court finds each error individually harmless, the cumulative effect of the errors nevertheless demonstrates that a miscarriage of justice occurred." We again disagree.

"In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself. '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*In re Reno* (2012) 55 Cal.4th 428, 483.) Here, we have carefully reviewed the record and found no such errors. Because we have found no errors, there is nothing to cumulate. Accordingly, we reject Pierce's cumulative prejudice claim. (See *People v. Duff* (2014) 58 Cal.4th 527, 562 [rejecting cumulative prejudice claim where, as here, there was "nothing to cumulate"].)

## **DISPOSITION**

The judgment is affirmed.

FAIN, J.*

WE CONCUR:


HILL, P. J.


FRANSON, J.

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.